**McDONOUGH CONSTRUCTION CO.**
**and Raymond International, Inc.,**
**Plaintiffs,**

v.

**H. B. FOWLER & CO., Inc., and L. B.**
**Foster Company, Defendants.**

**No. 7964.**

United States District Court
E. D. Louisiana,
New Orleans Division.

March 5, 1968.

Harry S. Redmon, Jr., New Orleans, La., for plaintiffs.

Paul V. Cassisa, New Orleans, La., for defendant, L. B. Foster Co.

Robert B. Deane, New Orleans, La., for defendant, H. B. Fowler & Co., Inc.

RUBIN, District Judge.

This is an action brought jointly by the owner and the charterer of the Barge BL–207 for damages sustained by that barge against a contractor who agreed to furnish steel pilings to the charterer and load them aboard a barge and against the subcontractor who undertook that obligation under a subcontract.

■ Most of the issues fall quickly into place once we resolve the basic factual controversy: was the BL–207 the

barge that was actually supplied by the charterer and loaded by the subcontractor during the period October 27, 1964 to November 3, 1964? I find that it was.

The background facts are clear. Raymond International, Inc. ("Raymond") needed steel piles for a construction job. Raymond bought the piles from The L. B. Foster Company ("Foster") under a contract requiring Foster to load them on barges to be supplied by Raymond. Foster made a contract with H. B. Fowler & Company, Inc. ("Fowler") to cut piles in varying lengths, as provided in the contract, and load them aboard barges. Fowler's contract with Foster required Foster to supply the barges but in fact these were intended to be and were supplied by Raymond. The piles were from 126 feet to 159 feet in length and they were to be loaded in accordance with a schedule that would enable Raymond to unload the piles from the top of the barge in the sequence in which they were needed.

Raymond chartered the BL–207 bareboat from McDonough Construction Company ("McDonough"). This was a "jumbo" barge with an open steel hopper. Its cargo box was 10 feet deep and it measured 150′6″ in length at the bottom and 174′6″ in length at the top. It was 27′3″ wide at the bottom and 29′6″ wide at the top.

On October 27, 1964, an open steel hopper barge arrived at Fowler's yard. The plaintiffs say it was the BL–207; the defendants say it was some other barge. The loading schedule called for piles 127.5 feet in length to be loaded first and piles 152 feet in length to be loaded next.

Fowler's employees found they couldn't follow this schedule: Fowler claims this was because the barge they were loading was not the BL–207 but a barge with a "standard" size hopper. If so, depending on its model, it would have had a cargo box ranging from 135′ to 142′ at the bottom and from 151′ to 160′ at the top. In either event it would have accommodated the piles 127.5 feet long.

Therefore the problem could not be, as asserted by Fowler, that the barge was too short for the first layer of piles. It must have been the next group of piles, the ones 152′ long, that the barge could not accommodate.

Each of Fowler's three witnesses testified differently, and to some degree in conflict with the others, as well as at variance with the facts that are clearly established in some other manner. First, they claimed that the barge they loaded was some barge other than the BL–207 because they had to crib up the bottom to load the 127.5′ steel piling. But this would not have been necessary to load piles 127.5′ long even had the barge been the shortest standard barge. One Fowler witness says the top of the hopper on the barge wouldn't accommodate the longest lengths of pile and these were loaded atop the hopper. If so, the barge would have been one with a 151′ length at the top of the hopper, and it would follow that 96 pilings 152′ long or longer were loaded aboard it. This would have been 5 tiers of 18″ pile atop the hopper. All of the other witnesses, including Fowler's, say the loaded barge did not have such a stack atop the hopper but that virtually all the load was inside the hopper although one Fowler witness says 2 layers of pile were outside the hopper.

The loading sequence actually followed according to Fowler's Engineer (Fowler Exhibit No. 1) called for loading of the bottom layers in the following order: 12 piles 127.5′ long; 20 piles 126 feet long; 68 piles 152′ long. This means that 32 pieces of pile less than 128′ in length were put in the bottom of the barge. Each pile was 18″ in circumference. If a standard hopper barge was used, it would have had a width at the bottom of the hopper of 21′4″. The 32 pieces would have occupied only a little more than two rows at the bottom of the barge. Since the second layer of piles would have been loaded so that the piles on the second layer rested in the angles of the piles of the prior layer, the second layer would have been only about 4 feet above the

cribbing or about 6 feet above the floor of the barge. Since a standard hopper is 10′ to 11′ deep, it is obvious that the 152′ piles that were said to have been loaded next would have been loaded about one-half way up in the hopper. This means that the barge would necessarily have been either a jumbo barge or the largest standard barge, the one with a 160′ hopper, but Fowler's witnesses claimed that the barge they loaded was shorter than 160′ in length.

Mr. Roig testified that the barge was too short for the 126′ piles at the bottom, but that the 159′ piles went in all right after the 126′ piles were raised higher through cribbing. This would have been possible only if the barge had a jumbo hopper.

There can be little doubt that Mr. Curry actually inspected the BL–207 after it was loaded and that it was in fact the barge he looked at loaded with steel pile. Mr. Stickney surveyed the BL–207 for insurance purposes and it was in fact loaded with steel piles. Fowler says that Stickney found no "gaping hole" of the kind that was discovered in the barge after it was unloaded, but it is entirely possible that the hole into the wing tank developed after his survey as a result of collapse or decay of some of the dunnage used as cribbing. Indeed, the cracks in the cargo compartment that were later found beneath the sound timbers were only a few inches off the bottom; therefore, any light might not have been seen during Sitckney's survey of the wing tank since the cracks might have been under water.

Therefore, I find that the barge Fowler loaded was indeed the BL–207. Fowler says it used proper dunnage to build the cribbing and installed it properly. Here again Fowler's witnesses testified differently from each other about the type of dunnage used and the manner in which it was laid. The physical damage to the barge and the photographs of the remains of the dunnage convince me that some of the cribbing gave way, that the remaining supports were not adequate to bear the heavy load of piles properly, and that the damage to the deck of the hopper resulted from the use of defective dunnage and from its improper installation.

It is merely speculation to conjecture that something happened to the barge after loading, that the stow of piles may have been rearranged, or some other event may have intervened to cause the damage. The plaintiffs need not rule out all possibilities of disaster, misdeed or negligence. Mr. Curry's testimony and Mr. Stickney's survey indicate that the BL–207 was in seaworthy condition when it was delivered to Fowler, and the reasonable inference from the evidence is that the damage occurred as a result of. improper loading.

■■■ Raymond's demise charter with McDonough constituted a bailment.[1] The damage to the barge during the bailment makes Raymond liable to McDonough, for when the bailor shows that the vessel was damaged during the term of the charter, a presumption of negligence on the part of the bailee arises.[2]

■■■ But Raymond had a contract with Foster. Foster could not relieve itself of its obligations under the contract by subcontracting with Fowler.[3] Therefore Foster is liable to Raymond

1. New England Foundation Co., Inc. v. Rugo Const. Co., D.C.Mass., 1945, 60 F. Supp. 143; Alpine Forwarding Co. v. Pennsylvania R. Co., 2 Cir., 1932, 60 F. 2d 734; O'Brien Bros. Inc. v. City of New York, 2 Cir., 1925, 9 F.2d 542.

2. Cox v. Banks, E.D.Penn., 1943, 50 F. Supp. 871; Alpine Forwarding Co. v. Pennsylvania R. Co., 2 Cir., 1932, 60 F.2d 734; Demars v. Seaboard Sand & Gravel Corp., S.D.N.Y., 1934, 8 F.Supp. 625;

Howard v. Dobbins-Trinity Coal Co., 2 Cir., 1940, 111 F.2d 571.

3. "Neither the delegation of performance by an obligor, nor a contract with the obligor by a person to whom the performance is delegated to assume obligor's duty, extinguishes it or prevents recovery of damages from him if the duty is not performed." Restatement, Contracts § 160. See also 4 Corbin, Contracts § 866.

for any damages caused by improper loading of the barge even though it may have been Fowler's employees who loaded it. It may well be that Foster might not have been obliged to provide cribbing had it chosen to refuse. But when it elected to do so (through its subcontractor Fowler), it became responsible to furnish suitable dunnage and to install it properly, for its contract necessarily required that it do the work in a proper manner. Hence it owes Raymond reimbursement for the damages occasioned by its breach. It is hornbook law that Fowler in turn is liable to Foster for improper performance of its subcontract.[4]

■ The defense of laches evaporates in the sunlight of the evidence at the trial. On February 12, 1965, only 3½ months after the BL–207 was loaded, and only 2 weeks after McDonough discovered that it was damaged, Raymond notified Foster of the damage and that the barge was available for a damage survey. Foster elected to stand on its contract with Fowler and in turn notified Fowler. Instead of investigating, Fowler denied responsibility. I see neither unreasonable delay nor prejudice, both of which are essential to support the defense of laches.[5]

Were the statute of limitations controlling, it would not bar the action. The suit by Raymond and McDonough is brought in contract as well as in tort. The prescriptive period for an action for breach of contract is clearly ten years. LSA Civil Code Art. 3544. Foster's claim over against Fowler is likewise for breach of contract.

■ The defendants have not questioned the right of McDonough to assert a claim under the contract between Raymond and Foster. Nor have the defendants questioned Raymond's right to recover from Foster prior to a judicial determination of Raymond's liability to Mc-

Donough for the damage to the barge. As bailor and bailee, both McDonough and Raymond have the right to sue for the damage to the barge. Am.Jur., Bailments § 246. The bailee's right to assert a claim for damage to the bailed property rests "upon his special property therein arising out of his exclusive right of possession and his actual possession or right of possession thereof at the time of such loss and injury, and his liability over." Hudson Transit Corp. v. Antonucci, N.J.App.1948, 137 N.J.L. 704, 61 A.2d 180, 4 A.L.R.2d 1374. See also Pendleton v. Benner Line, 1918, 246 U.S. 353, 38 S.Ct. 330, 62 L.Ed. 770. Although the cases dealing with the right of the bailee to assert the claim for damages normally deal with actions in tort, the rationale upon which that right is based is equally applicable to an action for breach of contract. Therefore, there is no basis for limiting the bailee's right to asserting only claims in tort. Similarly, there is authority for the assertion of the bailee's contract claim by the bailor. New Jersey Steam Navigation Co. v. Merchant's Bank, 1848, 47 U.S. 343, 12 L.Ed. 465.

■ McDonough need not assert the contractual right of its bailee in order to recover the damage to its barge, but can assert its claim as a third party beneficiary of the contracts entered between Raymond and Foster and between Foster and Fowler. Both contracts clearly import the requirement that the loading of the barge be accomplished in a workmanlike manner. Ryan Stevedoring Co., Inc. v. Pan-Atlantic Corp., 1956, 350 U.S. 124, 76 S.Ct. 232, 100 L.Ed. 133. This implied condition is in the nature of a warranty that inures to the benefit of the owner of the barge whether there is privity between the owner and the party warranting the work or not. Crumady v. The J. H. Fisser, 1959, 358 U.S. 423, 79 S.Ct. 445, 3 L.Ed.2d 413; Waterman S.S. Corp. v. Dugan & McNamara, Inc., 1960,

---

4. 4 Corbin, Contracts § 866.

5. Gutierez v. Waterman Steamship Corp., 1963, 373 U.S. 206, 83 S.Ct. 1185, 10 L.

Ed.2d 297; Cities Service Oil Co. v. Puerto Rico Lighterage Co., 1 Cir., 1962, 305 F.2d 170; Pure Oil Co. v. Snipes, 5 Cir., 1961, 293 F.2d 60.

364 U.S. 421, 81 S.Ct. 200, 5 L.Ed.2d 169.

## DAMAGES

The cost of repairs amounted to $7,-041.73. The plaintiff should also recover survey costs amounting to $159.25. The barge was off hire from February 1 to February 26 as a result of the damage. The evidence satisfies me that McDonough's barges are on hire 80% of the time. The BL–207 had been on charter for $35.00 per day to Raymond and had been on charter to Avondale both before and after the casualty for $40.00 per day. Demurrage is allowed for 21 days (80% of 26 days) at $37.50 (average of $35.00 to $40.00 per day), a total of $787.50. Interest will be allowed at 5% per annum from February 1, 1966.

## ATTORNEY'S FEES

▇▇ Foster has cross claimed against Fowler for judgment over, and for attorney's fees. Foster's liability to the plaintiffs results from Fowler's breach of its implied contractual obligation to perform the loading of the barge in a proper manner. Reasonable attorney's fees incurred by Foster in defending the action brought by the owner and charterer are foreseeable consequences of Fowler's breach of its implied contractual obligation. Such foreseeable consequential expenses are properly awarded when an indemnity obligation exists.[6] Fowler must therefore indemnify Foster for attorney's fees incurred in defending the action brought by the owner and charterer.[7]

No stipulation was entered concerning what would constitute a reasonable attorney's fee for Foster's defense of the claim brought by the plaintiffs. Nor was any evidence introduced at the trial concerning this item of damages. Instead, it was stipulated by the parties that the Court would set the fee based upon its familiarity with the case and the amount of work involved in preparation and trial of the case.

This case was tried in one day. Prior to trial the attorney for Foster was required to attend one pre-trial conference. I find that $750.00 is a reasonable fee for that part of his services that represents his defense of plaintiffs' claim, as distinguished from the part of his fee allocable to asserting the indemnity claim.

At the trial Raymond sought leave to amend the complaint to assert a claim for attorney's fees. Its motion for leave to amend was opposed by both Foster and Fowler, and the matter was taken under advisement.

▇▇ As a general rule attorney's fees are not awarded as damages in a suit for breach of contract. 5 Corbin, Contracts § 1037; 22 Am.Jur.2d, Damages § 165. Attorney's fees may be awarded, however, to the extent that they represent a reasonable and necessary expense incurred in defending a claim for which the defendant owes indemnity. Rogers v. United States Lines, 3 Cir., 1962, 303 F.2d 295; General Electric Co. v. Mason & Dixon Lines, Inc., W.D.Va., 1960, 186 F.Supp. 761. See also Restatement, Contracts § 3. "It is fundamental that there shall be no recovery for attorneys' services and expenses incurred in establishing the right of indemnity." General Electric Co. v. Mason & Dixon Lines, Inc., W.D.Va.1960, 186 F.Supp. 761, 766. Raymond has not been called upon to defend any claim for which either Foster or Fowler owes indemnity. While it is true that McDonough could have sued Raymond, and that Raymond would have been entitled to indemnity had it incurred expense in defending such a suit, the fact

---

6. See De Giois v. United States Lines Co., 2 Cir., 1962, 304 F.2d 421; Brown v. San Alberto Cia Armadora, S.A., 3 Cir., 1962, 305 F.2d 602; Shenker v. United States, 2 Cir., 1963, 322 F.2d 622.

7. Rederi A/B Dalen v. Maher, 4 Cir., 1962, 303 F.2d 565; Ellerman Lines, Ltd. v. Atlantic & Gulf Stevedores, Inc., 3 Cir., 1964, 339 F.2d 673; Strachan Shipping Co. v. Koninklyke Nederlandsche S.M., M./V., 5 Cir., 1963, 324 F.2d 746; Holley v. The Manfred Stansfield, E.D.Va., 1960, 186 F.Supp. 805.

of the matter is that McDonough and Raymond joined in bringing the action. The attorney's fees incurred by Raymond arose when it asserted its claim against the defendants, and it may not therefore be recovered. In view of the lack of merit of the proposed amendment, Raymond's motion to amend its complaint is denied. The lack of merit of the proposed amendment obviates any need to consider the timeliness of the motion. Laitram Corporation v. Deepsouth Packing Company, Inc., E.D.La. C.A. 67–861, January 26, 1968, 279 F.Supp. 883.

For the reasons assigned, it is ordered that there be judgment in favor of plaintiffs and against defendant L. B. Foster Company in the amount of $7,988.48 plus interest at the rate of 5% per annum from February 1, 1966.

It is further ordered that there be judgment over in favor of L. B. Foster Company and against H. B. Fowler & Company, Inc., in the amount of $7,988.48 and interest at the rate of 5% per annum from February 1, 1966, plus $750.00 for attorney's fees.