Jack **CANTERBURY** et al.

v.

Albert **DICK** and C. E. **Erwin**, Individually and d/b/a Bayer's Shell Service.

Civ. A. No. 70–V–26.

United States District Court,
S. D. Texas,
Victoria Division.

Jan. 30, 1973.

Mr. George C. Dixie, Houston, Tex., for plaintiffs.

Mr. Eric P. Weisberg, Denison, Tex., for defendants.

## MEMORANDUM AND ORDER

OWEN D. COX, District Judge.

Plaintiffs, Jack Canterbury and others, former employees of Defendants Albert Dick and C. E. Erwin, d/b/a Bayer's Shell Service, have brought suit to recover unpaid minimum wages and overtime compensation for labor performed during the period from December 22, 1967, to November 28, 1970. Defendants have admitted by their original answer that their employees were, during said period, engaged in commerce and were employed by an enterprise engaged in commerce.

The Plaintiffs contend Fair Labor Standards Act coverage, the primary ground being that Bayer's Shell Service was a commercial truck stop as defined by the Act and the regulations promulgated by the Secretary of Labor, and thus not entitled to exemption from the Act as a retail filling station under 29 U.S.C. § 213(a)(2). In the alternative, Plaintiffs contend that Defendants' operations constituted an enterprise engaged in commerce as defined in 29 U.S.C. § 203(s)(1).

First, we'll discuss the physical assets of the service station as it existed during the period of time here in question. It was located at the juncture of U.S. Highways 77 and 59 south in the City of Victoria, Texas. These were major traffic arteries carrying interstate traffic. It had ten gasoline pumps in the front of the station and two Diesel pumps in the rear. It was not associated with a restaurant or with a motel or with any other similar facility. It advertised coffee for truckers, but the coffee was available for all customers. Its restrooms were air-conditioned and this service was advertised. But, there were no showers available for the drivers, nor places for the drivers to sleep. It had no garage or repair shop, and the employees made no significant repairs to vehicles of customers, although the employees have called for mechanics to assist truckers upon request. The only special equipment was for changing truck tires. It offered no specialized services other than the sale of motor fuels.

The front of the filling station along the highway, although perhaps broader than many, was a ten-pump station to serve automobiles, small trucks, pickups, and the sort, and, generally speaking, gave the appearance of the ordinary retail filling station.

As to the pumps in the rear of the station building, originally one pump was for regular gas and the other for Diesel. But, in recent years, that is, the last two or three, both pumps have dispensed Diesel fuel, and it was here that the large trucks, five axle and better, were fueled, oiled, and tires changed when necessary. Two customers parked trucks on the premises in the back of the station, and perhaps seven trucks were parked there from time to time. The station advertised Diesel fuel by large signs. These two pumps in the rear could service the trucks without interfering in any way with the normal routine service that

was given vehicles at the pumps in the front area of the filling station.

The station advertised Diesel fuel by large signs and also Coca-Cola. There were other signs indicating it was a Ryder fuel stop. As a Ryder fuel stop, the station handled Ryder rental trucks, and there was no discount in connection with such business, but there was a discount granted to the trucking groups that used the station.

Secondly, we need to review the operations of the service station. The Plaintiffs were involved in doing the work called for. More than fifty percent of the station's sales was gasoline, and less than fifty percent of its sales was Diesel fuel, and it offered a rebate or a discount on all sales of gasoline or Diesel fuel. The Diesel pump price had been 32.5¢ but later 33¢, and the sale of that fuel carried a discount of 5¢ and later carried one of 6¢ for all sales over 25 gallons. This discount was also applicable to gasoline. However, it is well to note here that while Diesel truck purchases averaged about 150 gallons, the passenger car tank usually doesn't hold much more than 20 gallons, and the average gasoline purchases are less than a full tank.

The rebate above referred to ranged from two to six percent per gallon, depending on the market conditions, and was generally paid directly to the driver of the vehicle, whether the sale was a cash sale or on credit. Bayer's Shell Service had approximately thirty credit customers, other than credit cards, most of which were light or short accounts. There was no additional or special discount to fleet accounts, other than the rebate or discount which has already been mentioned. There were some retail Diesel sales, but the large truck Diesel customers have increased in number during the past years.

The Diesel trucks had an oil capacity of approximately 48 quarts, while the ordinary automobile or small truck had an oil capacity of 5 quarts. So, it seems obvious more oil was sold to the Diesel trucks than to other customers.

The filling station had cards printed which advertised air-conditioned restrooms and free coffee to truck drivers, and obviously these cards were to solicit truck business. The station sold innertubes for truck tires and also hand-cleaner, flashlights, cushions, and flashers.

It was open 24 hours a day and serviced trucks, tourists, and persons in the neighborhood. It had account customers, other than oil company credit-card holders, which were mostly commercial, rather than passenger-car customers. The sales to private passenger automobiles were not insignificant.

 The Court, having discussed the physical property of Plaintiffs and their operations and made findings of fact relating thereto, now must be concerned with the question of whether or not Defendants' service station is a retail establishment. We must keep in mind that the burden is on the employer to bring his employees within the scope of the exemption; and, the exemptions are to be narrowly construed against the employer. Arnold v. Ben Kanowsky, Inc., 361 U.S. 388, 393, 80 S.Ct. 453, 4 L.Ed.2d 393 (1959).

 If Bayer's Shell Service is a retail establishment, then Defendants are exempt from the Act by virtue of the provisions of 29 U.S.C. § 213(a)(2). To answer this quesion, we will first refer to the pamphlet designated "Part 779—The Fair Labor Standards Act, as Applied to Retailers of Goods for Services," consisting of regulations promulgated by the Administrator, and in evidence as Plaintiffs' Exhibit 1. The Administrator's regulations, while not binding on the courts, are entitled to careful consideration and considerable weight. Skidmore v. Swift & Co., 323 U.S. 134, 65 S.Ct. 161, 89 L.Ed. 124 (1944); Wirtz v. Keystone Readers' Service, Inc., 418 F.2d 249 (5th Cir. 1969).

Section 779.312 of the pamphlet defines "retail or service establishment" as "an establishment 75 per centum of

whose annual dollar volume of sales of goods or services (or of both) is not for resale and is recognized as retail sales or services in the particular industry." This definition was in the 1949 amendment to the Act and the meaning has not changed by subsequent amendments.

In 779.313, it says that an establishment, to be a "retail or service establishment,"

"(a) . . . must engage in the making of sales of goods or services; and (b) 75 percent of its sales of goods or services, or both, must be recognized as retail in the particular industry; and (c) not over 25 percent of its sales of goods or services, or both, may be sales for resale."

In 779.316, it provides that the term "retail" is alien to some businesses or operations, and further states,

"It also should be noted from the judicial pronouncements that a 'retail concept' cannot be artificially created in an industry in which there is no traditional concept of retail selling or servicing. * * * Such establishments not having been traditionally regarded as retail or service establishments cannot under any circumstances qualify within the statutory definition of the Act. * * *."

We also quote from 779.317:

"There are types of establishments in industries where it is not readily apparent whether a retail concept exists and whether or not the exemption can apply."

This section then sets out a partial list of establishments to which the retail concept does not apply. The only pertinent establishment within this list is "Truck stop establishments."

In 779.318, a retail or service establishment is classified as one which sells goods or services to the general public. And, in 779.320, the Secretary of Labor classifies "Filling stations" and "Auto-mobile laundries" and "Automobile repair shops" and "Coal yards" as retail establishments.

But, we cannot overlook 779.328, which says the distinction between a retail sale and a wholesale sale is one of fact. Typically, retail sales are made to the general consuming public; and there are reasonably definite limits as to the quantity of a particular commodity which the general consuming public regularly purchases at any given time at retail, and businessmen are aware of these buying habits. These purchases are usually numerous and involve small quantities of goods or services. On the other hand, wholesale establishments confine their sales to other wholesalers, retailers, and industrial or business purchasers in quantities greater than are normally sold to the general consuming public at retail.

We need to determine, at this point and in the light of the facts heretofore set forth and the regulations just cited, if Bayer's constitutes a truck-stop establishment. In 779.371(c), it is mentioned that sales to motor carriers of services, fuel, equipment, or other goods or facilities by establishments commonly referred to as truck stops, are not retail. Such establishments, which are physically laid out and specially equipped to meet the highway needs of the motor transportation industry, offer a variety of services to truckers on a "one-stop" basis, and provide services principally to motor carriers and their crews. They are an integral part of the interstate transportation industry and are not within the tradiional retail concept. Sales of Diesel fuel (and LP gas) for use as truck or bus fuel and the repair and servicing of trucks and buses used in over-the-road commercial transportation (including parts and accessories for such vehicles) are specialized goods and services "which can never be sold at retail * * * whatever the terms of the sale." Sales of these items are nonretail whether made by truck stops *or other establishments.*

■ The Court concludes the defendants' establishment is not a "truck stop," as the term is used by the Administrator's regulations, in that said establishment, while possibly being specially equipped and physically laid out to meet some of the needs of the motor transportation industry, is not designed to meet all of said needs, does not offer a variety of services to truckers on a "one-stop" basis, and does not provide services *principally* to motor carriers and their crews. Therefore, Defendants are not excluded from the retail exemption by reason of being a truck stop.

Admittedly, there is no "Enterprise" coverage under 29 U.S.C., § 206(a), which would deprive Defendants of the exemption.

■ However, there is one further contention made by Plaintiffs based upon the fact that during the relevant period more than 25% of Defendants' annual dollar volume of sales was sales of Diesel fuel for use as truck fuel. Sales of Diesel fuel for use as a truck fuel are nonretail, as pointed out in the discussion of 779.371(c), whether made by truck stops or other establishments such as Bayer's. Therefore, it seems to this Court that Defendants have failed to bring themselves within the retail exemption of Section 13(a)(2) of the Act [29 U.S.C., § 213(a)(2)], in that Defendants' annual dollar volume of sales was not 75% retail sales.

Defendants seek to avoid this result by contending the regulation on Diesel fuel sales [29 C.F.R., § 779.371(c)(7)] is incorrect or unreasonable and should not be followed. Defendants contend that none of their sales are for resale, a point not disputed, and that sales of Diesel fuel for use as truck fuel are recognized as retail in the industry; and, therefore, the regulation is incorrect. Whether or not it is so recognized in the particular industry with which we are dealing here, really makes no difference, unless we are ready to disregard the Administrator's regulations as to Diesel fuel.

Defendants seem to be urging the "industry usage" test. In Idaho Metal Works v. Wirtz, 383 U.S. 190, 86 S.Ct. 737, 15 L.Ed.2d 694 (1965), the Supreme Court expressly rejected that as the controlling criteria. The Supreme Court recognized that some sales can never be retail, regardless of the view of the industry. In examining the legislative history of the exemption, the Supreme Court discovered statements about the "nonretail status of quantity sales at discounts" and the term retail becoming less apt "as the quantity and price discount increase." The Wage and Hour Administrator has determined that sales of Diesel fuel *for use as truck or bus fuel* can never be retail sales. This Court does not regard that determination as unreasonable in light of the industry practice of making such sales in large quantities and at significant discounts. The ordinary consumer purchaser of motor fuels does not buy in quantities of 150 gallons, as do most trucks, nor does he receive a discount on his purchase, as do truck drivers. In making his determination, the Administrator has available to him the views of *all* members of the industry, well-settled business habits, traditional understandings, common knowledge, private and governmental research and statistical organizations, legislative history, numerous court decisions, and his own experience with the Act. This Court is not inclined to ignore that determination. Also, disregarding this factor, the nature of its business, generally, does not fit the accepted standard of a retail establishment.

The stipulated time sheets of each Plaintiff accurately reflect the hours worked during each workweek of the relevant period and the hourly rate of compensation received. During the period December 22, 1968, until November 28, 1970, Defendants employed

Plaintiffs in commerce for workweeks longer than forty hours without compensating Plaintiffs for hours worked in excess of forty per workweek at rates not less than one and one-half (1½) times the regular rate of compensation. Also, during this period, Defendants employed Plaintiffs in commerce at wages less than $1.60 per hour, the minimum wage under the Act.

Therefore, Plaintiffs are entitled to recover for unpaid overtime and unpaid minimum wages due them under the Act from Defendants. The amounts due, as computed by the Wage and Hour Division of the Department of Labor (such computations not being disputed by Defendants), based on the time sheets of the individual Plaintiffs which were admitted as evidence in the trial of this case, are:

| | | |
|---|---|---|
| (1) | Jack Canterbury | $2,604.00 |
| (2) | Claude Canterbury | 4,848.00 |
| (3) | Larry Canterbury | 864.00 |
| (4) | LeRoy Buckner | 4,356.00 |
| (5) | Byron Buckner | 480.00 |
| (6) | William R. Thornton | 1,860.00 |

Plaintiffs are not entitled to recover an amount equal to the unpaid minimum wages and unpaid overtime compensation as liquidated damages.

The Court finds that $2,750.00 is a fair and reasonable attorney's fee for legal services rendered to and for Plaintiffs by their counsel in this suit; and Plaintiffs are entitled to recover such reasonable attorney's fee in such amount from the Defendants.

The foregoing constitutes the findings of fact and conclusions of law in this case. The counsel for Plaintiffs shall furnish to the Court a form of judgment in accordance therewith within twenty (20) days from the date hereof. The Clerk will furnish copies of this memorandum and order to the appropriate parties.