PETER FABRICS, INC., Plaintiff,

v.

S.S. "HERMES", a/k/a "Hermes I," her engines, boilers, etc., Italia Di Navigazione Societa Per Azioni a/k/a Italian Line, and Hermes Shipping K.K. Tokyo, Defendants.

ITALIA DI NAVIGAZIONE SOCIETA PER AZIONI a/k/a Italian Line, Defendant, Third-Party Plaintiff-Appellant, Cross-Appellee,

v.

MASSACHUSETTS PORT AUTHORITY, Third-Party Defendant-Appellee, Cross-Appellant.

Nos. 1093, 1135, Dockets 84–7930, 84–7952.

United States Court of Appeals, Second Circuit.

Argued April 25, 1985.

Decided June 14, 1985.

Clarkson S. Fisher, Jr., George J. Koelzer, Evans, Koelzer, Osborne & Kreizman, New York City, for third-party defendant, appellee, cross-appellant.

Enrico S. SanFilippo, Kirlin, Campbell & Keating, New York City, for defendant, third-party plaintiff-appellant, cross-appellee.

Before FEINBERG, Chief Judge, and FRIENDLY and NEWMAN, Circuit Judges.

FRIENDLY, Circuit Judge.

This suit in admiralty was brought in the District Court for the Southern District of New York by Peter Fabrics, Inc. against the Italia di Navigazione Societa per Azioni (Italian Line), as charterer and operator of the S.S. Hermes; Hermes Shipping K.K. Tokyo, owner of the S.S. Hermes; and the S.S. Hermes, to recover for the loss of 97 rolls of fabric being transported by Italian Line on the Hermes from Leghorn, Italy, to Boston, Massachusetts. No appearance was made on behalf of defendants Hermes Shipping K.K. Tokyo or the Hermes, and the action apparently proceeded as if they had never been served with the complaint. Italian Line answered Peter Fabrics' complaint and filed a third-party complaint against Massachusetts Port Authority (Massport), which had agreed to provide terminal and stevedoring services for Italian Line's vessels at the Moran Container Facility in Boston; the third-party complaint alleged that any loss occurred while the shipment was in the care of Massport and was due to Massport's "negligence, breach of contract and/or breach of warranty express or implied. . . ." In a first opinion, reported in 1984 AMC 1685 (1984), Senior Circuit Judge Lumbard, sitting by designation, (1) gave judgment to Peter Fabrics on its complaint after finding that

Italian Line had failed to rebut Peter Fabrics' *prima facie* case of pilferage of the 97 rolls from a container which contained 617 rolls of fabric when it was padlocked, sealed and accepted for transportation in Italy, but only 520 rolls when it was found unlocked and with a broken seal on delivery to the consignee's truckman in Boston, *cf. Spencer Kellogg v. S.S. Mormacsea,* 703 F.2d 44, 46 (2 Cir.1983); (2) dismissed Italian Line's third-party complaint against Massport because Italian Line had not established that it delivered a container with 617 rolls of fabric to Boston, thereby putting them within Massport's control; and (3) granted Massport leave to file a counterclaim against Italian Line for indemnification, under a clause in its stevedoring agreement with Italian Line, of the legal expenses incurred by Massport in defending itself. In a supplemental opinion, Judge Lumbard denied Italian Line's motion for a new trial and agreed to hold a hearing on Massport's counterclaim. In a second supplemental opinion, issued after three days of hearings on the counterclaim, he allowed Massport $15,000 in attorneys' fees plus $2,856.56 in expenses for its defense of Peter Fabrics' complaint and Italian Line's third-party complaint, and $3,500 in attorneys' fees plus $727 in expenses incurred proving its claim for attorneys' fees. This award was considerably less than the $28,958 in attorneys' fees and $4,845 in expenses Massport had requested for defending the primary claims, and the $6,230 in attorneys' fees and $1,288 in expenses it had sought for proving its claim for attorneys' fees.

Italian Line has not appealed from the judgment against it in favor of Peter Fabrics. It has appealed the dismissal of its third-party complaint against Massport, the grant of leave to Massport to file a counterclaim, and, assuming that such leave was properly given, the award of attorneys' fees and expenses to Massport. Massport has cross-appealed the court's reduction of its request for attorneys' fees.

## THE FACTS

The district court reasonably found the facts to be as follows:

The fabrics here at issue, purchased from three Italian mills, were trucked to the warehouse of Albini & Pitigliani, an international freight forwarder, in Prato, Italy, which loaded them into an empty Italian Line container, # ITAU 402767/7, for transportation to Leghorn, Italy. On receipt and twice during loading, counts of the goods received were made at the warehouse and showed 617 rolls. After the fabrics were loaded, the only empty space in the container was an area which could accommodate one or two rolls at the top of each tier. A padlock # 6510, bearing the logo "ALPI," was affixed to the container, which was then trucked to Leghorn. One of the two keys to this padlock was given to the driver, who passed it on to the forwarder's representative at Leghorn, who, in turn, returned it to the forwarder, which transmitted it to its representative in Boston. At Leghorn, the Italian fiscal police opened and inspected the container but did not count the rolls. The container was relocked, and an Italian Line seal, # 21626, was affixed to the door of the container. The container was weighed by an official from the Italian Chamber of Commerce, who recorded a net weight of 15,015 kilos on the bill of lading and dock receipt supplied by Italian Line. This weight corresponded exactly with the sum of the weights listed on the separate packing lists prepared by the three mills from whom the fabrics were purchased. Italian Line then accepted delivery of the container from the freight forwarder's representative and issued a bill of lading calling for shipment aboard the Hermes of one container, # ITAU 402767/7, containing 617 rolls of fabric weighing 15,015 kilos, padlocked with lock # ALPI 6510 and sealed with Italian Line seal # 21626. The container was stowed on the deck of the Hermes.

The vessel proceeded from Leghorn via Naples and Barcelona to New York, Baltimore, Norfolk and then to Boston before proceeding to its final port of call in St. John's, New Brunswick. There was evidence that at least two other containers

stowed on deck were breached at Naples. Sixteen containers unloaded in New York had broken or missing seals; a container unloaded at Baltimore had its seal and padlock missing.

Upon arrival at Boston the Hermes was docked at the Moran facility, which is owned by Massport. Massport's stevedoring at Moran was actually conducted by Bernard S. Costello, Inc. (Costello), which is not a party to this action. The contract between Italian Line and Massport required that the latter should

> [c]heck and tally ... container numbers and seals, provided, however, that [Italian Line] shall provide blank port labels and seals. In the event seals are missing or broken, [Massport] shall notify agent and re-seal, the additional cost of which shall be for [Italian Line's] account.

This check required by the contract was made by William Deering, a Costello employee. Deering's tally sheet for the Hermes showed one discharged container with a missing seal and the number of the Massport seal that resealed the container. The only notation opposite container # ITAU 402767/7 was the letters "LS/CR," indicating the presence of a "crease" or dent on the container's left side. At the trial, the security foreman from the Moran Terminal demonstrated how it is possible to cut a seal and then bend it back and reattach it so that the break would not be detected without a physical or close visual examination; he also testified that the checker did not ordinarily physically check the seal. On the other hand, while Massport was not required to report the presence or absence of padlocks, the testimony showed that if a padlock was present, the standard practice was for the checker to note this on the tally sheet. The trial judge permissibly inferred from the absence of any reference on the tally sheet that the container had been unloaded without a padlock.

From March 4, when it was unloaded from the Hermes, until March 12, 1981, container # ITAU 420767/7 was stored in a yard at the Moran facility. Only one gate leads into the yard. It is manned by an armed guard 24 hours-a-day and only commercial vehicles with proper documentation are allowed to enter. The yard, covering 30 acres, is surrounded by a 7-foot high fence topped with 2 feet of barbed wire. An armed force patrols the perimeter and an unarmed force the interior of the yard. Guards in a tower approximately 90 feet high oversee the entire yard. Containers are stored door to door, 16 inches apart, so that the doors cannot be opened. The container at issue was stored "three high," which meant that its base was 16 feet off the ground. No break-ins were reported during the period in question.

On March 12, a trucker engaged by Peter Fabrics arrived to pick up the container. When he went to check the container out of the yard, he noticed that it had no padlock, something which, while not unusual for most containers, was not the practice for Peter Fabrics' shipments. He also noticed that the seal was broken and looped around the door of the container. The trucker immediately summoned a Moran clerk and a U.S. Customs Officer, who confirmed these observations. When the container was opened, the trucker noticed that a full tier-and-a-half of rolls were missing from the front of the container. The Customs Officer then resealed the container with a Customs seal.

After other events not necessary to recount, the container ended its journey in Gilbertsville, Massachusetts. In the presence of another Customs Officer, a representative of Peter Fabrics cut the still intact Customs seal and opened the container. When the contents were counted, the shortage of 97 rolls was revealed.

We shall state other facts as they become relevant.

DISCUSSION

I. *The Dismissal of Italian Line's Third-Party Complaint against Massport.*

 Little need be said to demonstrate that the court's finding that the 97 rolls had disappeared before the container came

into the custody of Massport is beyond successful challenge. Although Italian Line's case that Massport was responsible derived support from the failure of Deering's tally sheet to report that the seal of container # ITAU 402767/7 was broken or missing, this was adequately explained by the testimony demonstrating the feasibility of breaking the seal and then reattaching it in such a manner that the break would escape cursory observation. This testimony, together with the evidence of pilferage on the ship during her voyage, the absence of a padlock when the Hermes arrived in Boston, and the unlikelihood that the container was breached in the highly secure Moran yard or thereafter amply justified Judge Lumbard's conclusion that the loss had occurred before Massport became responsible for the container. We therefore affirm the dismissal of Italian Line's third-party complaint against Massport.[1]

II. *Allowing Massport to Amend its Answer Pursuant to F.R.Civ.P. 15(b) to Assert a Counterclaim for Indemnity Under the Contract*

■ Massport's counterclaim for indemnity came into the case in an unusual manner. No such counterclaim was pleaded in the answer. At the trial, Italian Line called as its last witness, John Mullaney, vice-president in charge of operations of Containership Agency, Italian Line's general agent in the United States, to testify to Italian Line's relationship with Massport. During this testimony, Italian Line offered in evidence a written contract between Italian Line and Massport. Counsel for Massport stated that the contract had not been produced by Italian Line in discovery and denied opposing counsel's claim that it had not been requested. He then stated:

I have no objection to this going in; however, I will have a motion after this witness testifies to amend my pleadings. Apparently we have a claim for indemnification against Italian Lines that was never made known to us, also provisions concerning this claim itself.

The judge then asked counsel for Italian Line if the contract was offered in evidence and counsel responded affirmatively.

During cross-examination, counsel for Massport had Mullaney read into the record certain provisions of the contract, including § XI-2, which provides for indemnity of Massport by Italian Line and which we quote below. Italian Line did not object to this line of questioning until counsel for Massport asked Mullaney whether the language of another provision limited Massport's liability to losses caused by Massport's negligence; the objection was that the question called for a legal conclusion. This led to a colloquy during which

1. We see no force in Italian Line's claim that the trial court erred by not inferring from Massport's failure to produce Deering that Deering's testimony would have been damaging to Massport's case. Italian Line relies on *Tupman Thurlow Co. v. S.S. Cap Castillo,* 490 F.2d 302, 308 (2 Cir.1974), where a ship failed to produce one of its own records pertaining to the ship's refrigerating system, and the court held that it was permissible to infer from a party's failure to produce evidence within its control that the evidence was unfavorable to the party's case. However, Deering was an employee of Costello, not of Massport. Italian Line knew how to locate him and could have attempted to have him testify at the trial or, failing that, compelled his appearance at a deposition, or both. Instead, after Massport failed because of the short notice to produce Deering for a deposition in compliance with a stipulation to produce "appropriate personnel" of Costello, and despite Massport's promise to schedule a later deposition, Italian Line failed to make any further attempts to obtain testimony from Deering until after the trial was over. Indeed, counsel for Italian Line stated on several occasions that if Massport attempted to call Deering as a witness at trial, he would object because of Massport's failure to produce him for the deposition. After trial, counsel for Italian Line apparently did contact Deering, and sought to obtain a new trial pursuant to F.R.Civ.P. 59 on the ground that Deering's testimony was "new evidence not available until now." The district court denied this motion on the ground that any testimony adverse to Massport that Deering might give "could easily have been obtained before trial" had counsel for Italian Line exercised "due diligence." In any event, in light of all the evidence offered at the trial, Judge Lumbard's finding that the fabrics were lost before the arrival of the Hermes in Boston would not be clearly erroneous even were we to draw the inference urged by Italian Line.

counsel for Massport stated that he asked the questions because:

> according to the contract which they now produce, we not only are immune from liability except for negligence which is solely, directly and proximately ours which causes the loss and then, according to what I read only in the amount of $500, but, in addition, because it arises out of a matter in the Moran Terminal we are entitled to indemnity from Italian Lines. That's the reason why I press the question.

Judge Lumbard sustained the objection, stating that "we can leave it to the argument of counsel and not to this witness." Italian Line rested after Mullaney's testimony. No further mention of a counterclaim by Massport for indemnity was made at the trial.

Approximately three weeks later, Massport submitted its post-trial brief together with a motion for leave to file a counterclaim. The motion was accompanied by an affidavit in which counsel stated that a counterclaim had not been brought earlier because he had not seen the written contract before the trial. Counsel noted that it was Italian Line that had offered the contract into evidence, and requested leave to amend under F.R.Civ.P. 15(b) "[s]ince all of the proofs relevant to the proposed counterclaim are before the Court (with the exception of damages) and in the absence of any prejudice to Italian Line...." Point III of Massport's post-trial brief also argued that under the contract "Massport is entitled to full indemnification from Italian Line, including its defense costs, expenses and attorneys' fees."

Italian Line submitted an affidavit of its counsel in opposition to Massport's motion to amend the answer. This affidavit argued that because Massport had never sought production of the contract from Italian Line and should have had its own copy, the counterclaim was barred by laches and the motion should be denied. The affidavit also argued, for reasons that are not clear, that "the merits of the proposed counterclaim do not warrant the granting of the motion." Italian Line did not then ask, in the alternative, for a hearing to submit evidence on the meaning of the contract; neither Italian Line's post-trial memorandum nor its reply to Massport's post-trial brief discussed Massport's counterclaim for indemnification.

In granting Massport leave to file a counterclaim, the trial judge explained that Massport's counterclaim had not "matured" prior to resolution of Peter Fabrics' primary claim; that "[a]ll the evidence necessary to rule on the counterclaim, with the exception of damages, is already before the court;" that Italian Line had not objected to the evidence but, in fact, had offered the contract into evidence; and that there was no prejudice to Italian Line in allowing Massport to amend its pleadings. We have some doubts about several of these reasons, particularly that Massport's counterclaim had not matured until the court had resolved other issues, *cf. Atlantic Aviation Corp. v. Estate of Costas,* 332 F.Supp. 1002, 1006–07 (E.D.N.Y.1971); *Lynch v. Sperry Rand Corp.,* 62 F.R.D. 78, 90 (S.D. N.Y.1973); *Index Fund v. Hagopian,* 91 F.R.D. 599, 605 (S.D.N.Y.1981), and that all the evidence necessary to rule on the counterclaim was before the court when in fact there was no evidence as to the meaning of the contract other than its own terms. Moreover, it is strange indeed that counsel for Massport did not know the terms of his client's own contract with Italian Line until the latter produced it at trial. Still, we uphold the decision to allow Massport belatedly to plead the counterclaim as within the wide discretion accorded to the trial court by F.R.Civ.P. 15(b). 6 Wright & Miller, Federal Practice and Procedure § 1493 at 469 & n. 74 (1971) (citing cases); *see, e.g., Browning Debenture Holders' Comm. v. DASA Corp.,* 560 F.2d 1078, 1086–87 (2 Cir.1977). The evidence as to whether the fault was Italian Line's or Massport's had been produced; all that was missing was evidence of the meaning of § XI–2 of the contract, assuming that introduction of such evidence would have been permissible, *cf. Heyman v. Commerce & Indus. Ins. Co.,* 524 F.2d 1317,

1320 (2 Cir.1975). When the contract was introduced into evidence by Italian Line, Massport made clear in the statements quoted above that, in its view, the contract established Massport's right to indemnification by Italian Line on its face and that it intended to assert such a claim. In view of Italian Line's failure to examine Mullaney, who testified that he had negotiated the contract for Italian Line, on this point at the trial or to specify later what parol evidence it wished to adduce, allowing the amendment was not an abuse of the trial court's wide discretion. *Cf. Dixson v. Newsweek, Inc.*, 562 F.2d 626, 633 (10 Cir. 1977) (post-trial motion for leave to amend properly granted where it was based upon a covenant in a settlement agreement between plaintiff and other defendants that had been filed with the court by the plaintiff).

### III. *Determination that Italian Line was liable to Massport on the Counterclaim*

Section XI–2 of the contract between Italian Line and Massport provides:

> [Italian Line] will defend, indemnify and hold harmless [Massport] from and against all claims, causes of action, suits, losses, damages, liabilities and expenses, including but not limited to cost of suit and attorneys' fees, based on or arising from the acts or omissions of [Italian Line] ... which arise out of or in any way relate to [Italian Line's] use of or presence at the facility. [Massport] shall give [Italian Line] reasonable notice of any such claim or suit against [Massport], and [Italian Line] shall have the right to compromise or participate in the defense of same as its own interests may appear.

**2.** This reads (emphasis added):

When a plaintiff asserts an admiralty or maritime claim within the meaning of Rule 9(h), the defendant or claimant, as a third-party plaintiff, may bring in a third-party defendant who may be wholly or partly liable, either to the plaintiff or to the third-party plaintiff, by way of remedy over, contribution, or otherwise on account of the same transaction, occurrence, or series of transactions or occurrences. In such a case *the*

Italian Line makes two arguments against the court's having concluded that this provision rendered it liable to indemnify Massport for having to defend the third-party claim. One of these is procedural, the other substantive. It will be convenient to consider them in reverse order.

Italian Line's substantive contention is that § XI–2 "presupposes" that the claim for which indemnification is sought is being asserted by a third party. Yet the claim made here fits neatly under the language of the first sentence of § XI–2. It arose out of "acts or omissions" of Italian Line in failing adequately to protect the container, which related to Italian Line's use of Massport's facility in the sense that but for such use Italian Line would not have made a claim against Massport. Italian Line's argument that the clause does not cover the instant claim rests primarily on the second sentence. There would be no point, it says, in requiring notice to Italian Line and providing the right to compromise or participate in the defense of a claim that Italian Line itself had brought against Massport. There are three answers. The draftsman could have included the second sentence to cover suits brought by someone other than Italian Line without thereby restricting the generality of the first sentence. Moreover, because of F.R.Civ.P. 14(c),[2] a defendant-third-party plaintiff in an admiralty suit can require, as Italian Line did here, that a third-party defendant make his defense directly to the claim of the plaintiff as well as to that of the third-party plaintiff. *See Riverway Co. v. Trumbull River Serv.*, 674 F.2d 1146, 1154 (7 Cir.1982) (third-party defendant becomes a defendant to plaintiff's complaint); *see generally* 6 Wright & Miller, *supra*, § 1465 at 342–47. Finally,

*third-party plaintiff may also demand judgment against the third-party defendant in favor of the plaintiff, in which event the third-party defendant shall make his defenses to the claim of the plaintiff as well as to that of the third-party plaintiff in the manner provided in Rule 12 and the action shall proceed as if the plaintiff had commenced it against the third-party defendant as well as the third-party plaintiff.*

and conclusively, this court rejected almost exactly the same argument as that made by Italian Line in a case not cited by either of the parties, *O'Gee v. Dobbs Home, Inc.*, 570 F.2d 1084 (2 Cir.1978). In that case, a stewardess sued Dobbs, a caterer supplying food on United Air Lines flights, for negligently stowing a buffet on board a plane. Dobbs impleaded United, alleging that United's negligence was the cause of plaintiff's injuries. The jury found for the plaintiff and held Dobbs entirely responsible for the accident. United sought indemnity for the costs of defending the suit under a contract clause essentially identical to the clause here in issue, *see id.* at 1090 n. 8. In the district court, Dobbs argued successfully that the clause was not meant to apply to situations in which United was not a primary defendant but only a third-party defendant brought in by Dobbs. On appeal, this court reversed, reasoning that if United had been sued directly and had cross-claimed against Dobbs there would have been no question about the applicability of the indemnity provision and that the result should be no different simply because different procedural steps brought about precisely the same situation. *Id.* at 1090.

■ Italian Line's procedural argument is that it was not provided an opportunity to adduce evidence to support its interpretation of the meaning of the indemnity clause. After Massport's motion for leave to file a counterclaim was granted, Italian Line filed a motion for a new trial pursuant to F.R.Civ.P. 59 and an answer to the counterclaim; Massport responded by requesting the court to grant Massport relief on the counterclaim. In a letter, counsel for Italian Line maintained that granting judgment on Massport's counterclaim would be premature and stated "[w]e have filed an answer ... denying its allegations and request our day in court both as to the counterclaim and the quantum of damages, if any." A hearing was scheduled. At the outset, counsel for Italian Line asked "I would like to know what this hearing will consist of, what will it take care of? Am I to assume that liability has already been adjudicated here?" The court answered in the affirmative, and counsel objected on the basis that "liability has been adjudicated without giving us an opportunity to properly have discovery with regard to that phase of the case." The court replied that it had already ruled on liability and limited the hearing to the quantum of damages. Although it does not in fact appear that the district judge ever expressly determined Italian Line's liability on the indemnification clause of the contract, any error resulting from the failure to permit Italian Line to contest the merits of Judge Lumbard's holding was harmless in light of *O'Gee* and the discussion above. As in *Lomartira v. American Automobile Ins. Co.*, 371 F.2d 550, 553 (2 Cir.1967), "neither at the trial nor on appeal have appellants stated what further facts or witness, if any, they would have brought forward on the issue [of indemnification]." Furthermore, Italian Line passed up several opportunities to argue the indemnity issue. It was alerted to Massport's claim during the cross-examination of Mullaney, who had negotiated the contract on behalf of Italian Line. Yet not only did Italian Line fail to pursue the issue on redirect, but it successfully objected to Massport's questioning Mullaney as to the meaning of the contract's language on the ground that interpretation of the contract called for a legal conclusion. Italian Line passed up a further opportunity to address Massport's arguments in its post-trial memoranda.

## IV. *The Award of Attorneys' Fees and Expenses*

The record does not show whether Massport had actually paid any fees to its attorneys or, if it had, what these fees were. Instead, its attorneys presented evidence of their ordinary billing rates and requested an award in that amount. After holding three days of hearings, Judge Lumbard issued a second supplemental opinion in which he awarded Massport attorneys' fees and expenses, but in an amount less than was sought.

Judge Lumbard divided Massport's claim for attorneys' fees and expenses into two groups: (1) fees and expenses incurred in defending the merits of Peter Fabrics' and Italian Line's complaints (the "merits trial"), and (2) fees and expenses incurred in the three days of hearings necessary to establish the size of the fees and expenses for defending Massport at the merits trial (the "damages trial").

In determining the fees and expenses to be awarded in connection with the merits trial, Judge Lumbard employed a two-step process. First, he found that the hourly billing rates for the services of all but one of Massport's attorneys should be reduced because these attorneys were relatively inexperienced and because overhead costs for Massport's lawyers, who worked primarily out of an office located in Red Bank, New Jersey, were lower than overhead costs for lawyers in large cities. This resulted in a reduction of Massport's alleged fees for the merits trial from $28,958 to $20,125. Second, because "[p]rudent counsel would not ask his client to pay $20,125 for legal services plus $3,556.56 in expenses to prevent a judgment for only $30,000 absent unusual circumstances" not found here, Judge Lumbard further reduced the fee award by 25% for a total of $15,000 in fees. He awarded counsel all but $700 of the $3,556.56 in expenses alleged to have been incurred for defending the merits trial (a total of $2,856.56); the $700 disallowed related to expenses, incurred on a trip to Boston to take a deposition, which "were not necessary to the taking of the deposition"—a point not here contested.

Judge Lumbard also reduced the attorneys' fees and expenses sought in connection with the damages trial: the $6,230 fee claim was reduced to $3,500, and the $1,288 expenses claim was reduced to $727. The reduction of the fees apparently was the result of reducing the hourly rates for the lawyers' services in the same fashion as was done with fees sought for defending the merits trial, without the further reduction of 25%. The expenses were reduced by $562 on the basis of the court's determination that the witness fees of one expert witness were excessive—again a point not contested.

On its appeal, Italian Line objects to any award of attorneys' fees or expenses incurred in connection with establishing the existence or size of Massport's indemnity claim. Massport objects on its cross-appeal to all of the reductions in its application for attorneys' fees.

### A.

■ It is established that while an indemnitee may recover from his indemnitor attorneys' fees and expenses incurred in defending a claim as to which he is indemnified, he may not recover fees and expenses incurred to establish his right against the indemnitor. *Flunker v. United States,* 528 F.2d 239, 246 (9 Cir.1975). This rule has been frequently applied by the courts both to indemnity obligations created by contract, *see, e.g., E.C. Ernst, Inc. v. Manhattan Constr. Co.,* 551 F.2d 1026, 1036–38 (5 Cir.1977); *Ranger Constr. Co. v. Prince William County School Bd.,* 605 F.2d 1298, 1303–05 (4 Cir.1979); *Signal Oil & Gas Co. v. Barge W–701,* 654 F.2d 1164, 1178–79 (5 Cir.1981), *cert. denied,* 455 U.S. 944, 102 S.Ct. 1440, 71 L.Ed.2d 656 (1982); *McDonough Constr. Co. v. H.B. Fowler & Co.,* 281 F.Supp. 90, 95 (E.D.La.1968); *Williams v. California Co.,* 289 F.Supp. 376, 380 (E.D.La.1968); *Becker v. Central Tel. & Utils. Corp.,* 365 F.Supp. 984, 990 (D.S. D.1973), *remanded on other grounds,* 509 F.2d 42 (8 Cir.1974), and to indemnity obligations implied by law, *see, e.g., Paliaga v. Luckenbach Steamship Co.,* 301 F.2d 403, 409 & n. 1 (2 Cir.1962); *Lusich v. Bloomfield Steamship Co.,* 355 F.2d 770, 776 (5 Cir.1966); *Bagby v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 491 F.2d 192, 198 n. 9 (8 Cir.1974); *Flunker v. United States, supra,* 528 F.2d at 246; *Vallejos v. C.E. Glass Co.,* 583 F.2d 507, 510 (10 Cir.1978); *General Elec. Co. v. Mason & Dixon Lines, Inc.,* 186 F.Supp. 761, 762–66 (W.D. Va.1960); *Grigsby v. Coastal Marine Serv.,* 317 F.Supp. 1113, 1116 (W.D.La. 1969), *cert. denied,* 396 U.S. 1033, 90 S.Ct.

612, 24 L.Ed.2d 531 (1970); *Rogers v. New Jersey Barging Corp.*, 567 F.Supp. 822, 830–31 (S.D.N.Y.1983). *But cf. Dillingham Shipyard v. Associated Insulation Co.*, 649 F.2d 1322, 1328 (9 Cir.1981) (fees to establish right to indemnity allowed where indemnitee conceded liability and paid injured party and indemnitor refused to concede same and forced indemnitee to litigate the issues).

Although none of these decisions analyzes or explains the basis for this rule, the reasoning behind it is not hard to understand. Indemnity obligations, whether imposed by contract or by law, require the indemnitor to hold the indemnitee harmless from costs in connection with a particular class of claims. Legal fees and expenses incurred in defending an indemnified claim are one such cost and thus fall squarely within the obligation to indemnify. Consequently, attorney's fees incurred in defending against liability claims are included as part of an indemnity obligation implied by law, *e.g., Paliaga, supra,* 301 F.2d at 409, and reimbursement of such fees is presumed to have been the intent of the draftsman unless the agreement explicitly says otherwise, *E.C. Ernst, Inc., supra,* 551 F.2d at 1037. As stated by the Fifth Circuit, "[t]his rule simply gives effect to the very nature of indemnity, which is to make the party whole." *Id.* Such reasoning does not apply to fees and expenses incurred in establishing the existence of an obligation to indemnify, since such expenses are not by their nature a part of the claim indemnified against. Rather, they are costs incurred in suing for a breach of contract, to wit, the failure to indemnify. As such, fees and expenses incurred in establishing the indemnity obligation fall within the ordinary rule requiring a party to bear his own expenses of litigation, *see* Berger, *Court Awarded Attorneys' Fees: What is "Reasonable"?,* 126 U.Pa.L.Rev.

281, 281 (1977). *Cf.* 5 Corbin, *Contracts* § 1037 (1964) (attorneys' fees and expenses may be recovered if they constitute damages from the breach of a contract but not if they are incurred in proving the breach).

Of course, when, as here, the obligation to indemnify arises out of a contract, the rule that an indemnitee cannot recover the costs of establishing the right to indemnification does not apply if "the agreement explicitly says otherwise." *E.C. Ernst, Inc., supra,* 551 F.2d at 1037. However, while the indemnity clause of Massport's contract with Italian Line, quoted above, contains the phrase "including but not limited to cost of suit and attorneys' fees," these words are more naturally construed as referring to legal expenses incurred in defending against the primary claim. Merely including the words "attorneys' fees" among the expenses indemnified against in the main action cannot reasonably be viewed as causing a shifting of fees in an action to establish the obligation to indemnify.[3] Since Massport does not have the right to be reimbursed for costs incurred in establishing the existence of an obligation to indemnify it, *a fortiori* it does not have the right to be reimbursed for costs incurred in establishing the amount of attorneys' fees to which it is entitled to be indemnified.[4] The analogy drawn by the district court to the allowance of the costs of obtaining fee awards in civil rights cases, *see Gagne v. Maher,* 594 F.2d 336, 343–44 (2 Cir.1979), *aff'd,* 448 U.S. 122, 100 S.Ct. 2570, 65 L.Ed.2d 653 (1980), is not persuasive. The rationale underlying *Gagne* and other cases in which fees are awarded pursuant to statute is "the encouragement of attorneys to represent indigent clients and to act as private attorneys general in vindicating congressional policies," *Prandini v. National Tea Co.,* 585 F.2d 47, 53 (3 Cir.1978) (Title VII class

---

**3.** To the extent that *Schroeder v. C.F. Braun & Co.,* 502 F.2d 235, 244–45 (7 Cir.1974), holds to the contrary, it is not supported by the cases relied upon for the result it reaches and we decline to follow it.

**4.** To the extent that Massport's attorneys would have incurred expense in collating time records and billing rates in preparing a bill to Massport, they would not have been justified in thinking that Massport, much less its indemnitor, would pay for such expense.

action), often in a situation where a lawyer's application to a court is the only available method for obtaining payment. *See also Perkins v. Standard Oil Co.,* 474 F.2d 549, 554 (9 Cir.) (Clayton Act), *cert. denied,* 412 U.S. 940, 93 S.Ct. 2778, 37 L.Ed.2d 400, *supplemented,* 487 F.2d 672 (1973); *Bond v. Stanton,* 630 F.2d 1231, 1235 (7 Cir.1980) (§ 1983 action) (quoting *Weisenberger v. Huecker,* 593 F.2d 49, 53–54 (6 Cir.) (class action), *cert. denied,* 444 U.S. 880, 100 S.Ct. 170, 62 L.Ed.2d 110 (1979)); *Spray-Rite Serv. Corp. v. Monsanto Co.,* 684 F.2d 1226, 1250 (7 Cir.1982) (Sherman Act), *aff'd,* 465 U.S. 752, 104 S.Ct. 1464, 79 L.Ed.2d 1464 (1984); 2 Derfner & Wolf, Court Awarded Attorney Fees ¶ 16.02[3] (1984). This rationale is inapplicable to a private contractual indemnity clause, where Massport's attorneys needed only to send it a reasonable bill.[5]

### B.

Turning to Massport's cross-appeal, we affirm the court's reduction of the fees sought by Massport's attorneys for defending against Peter Fabrics' and Italian Line's complaints. The issue is to determine what Massport actually would have paid as a reasonable fee under its contract with Italian Line. In most cases of this sort, this is determined, without need to take up judicial and professional time, by the attorneys' sending a bill and the indemnitee's paying it in arm's length dealing. To be sure, the indemnitor is entitled to challenge the amount of the fees, but where the amount at issue in the primary claim is relatively small, that game is not worth the candle unless the perceived discrepancy between what the indemnitee actually paid and what the indemnitor thinks he should have paid is very large. In other cases, like this one, fees are sought not on the basis of payments actually made, but on the basis of what the attorneys allege they would have billed and/or the client alleges he would have paid. Disputes are more likely in such cases because final billings often differ from straight application of hourly rates and also because, where actual payments are not being made by the indemnitee, lawyers and clients are more likely to inflate their estimations of what they would have agreed to as a reasonable fee. If, as happened here, the indemnitor decides to challenge the amount of the putative fees and settlement efforts are unsuccessful, it is left to the court to determine the reasonable fee that the client would have paid.

Courts formerly accomplished the task of determining what was a reasonable fee quite simply. In some cases the trial judge made the determination on the basis of his familiarity with the case and his own former experience as a practitioner. *E.g., Canterbury v. Dick,* 385 F.Supp. 1004, 1009 (S.D.Tex.1973); *see* Berger, *supra,* 126 U.Pa.L.Rev. at 284 (this method found in 13 of 28 cases reviewed); Dawson, *Lawyers and Involuntary Clients in Public Interest Litigation,* 88 Harv.L.Rev. 849, 870–71 (1975). In other instances the trial court would take into account a list of relevant factors, but without specifying their relative weights or priorities. 2 Derfner & Wolf, *supra,* ¶ 15.01[1]; *e.g., In re Osofsky,* 50 F.2d 925, 927 (S.D.N.Y.1931); *Pergament v. Kaiser-Frazer Corp.,* 224 F.2d 80, 83 (6 Cir.1955) (per curiam); *Green v. Transitron Elec. Corp.,* 326 F.2d 492, 496 (1 Cir.1964); *Twentieth Century Fox Film Corp. v. Goldwyn,* 328 F.2d 190, 221 (9th Cir.), *cert. denied,* 379 U.S. 880, 85 S.Ct. 143, 13 L.Ed.2d 87 (1964); *Alpine Pharmacy, Inc. v. Charles Pfizer & Co.,* 481 F.2d 1045, 1050 (2 Cir.1973). Appellate courts rarely interfered with the fee deter-

---

**5.** In similar fashion, courts have refused to award fees for services in connection with the fee application where fees are recovered under the "common fund" or "common benefit" exceptions to the rule against fee shifting; the courts have reasoned that fees are recoverable in such cases on the theory that the attorney's services benefitted the plaintiff class while services performed in connection with the fee application confer no such benefit. *See Lindy Bros. Builders, Inc. v. American Radiator & Standard Sanitary Corp.,* 540 F.2d 102, 111 (3 Cir.1976) (*Lindy II* ); *City of Detroit v. Grinnell Corp.,* 560 F.2d 1093, 1102 (2 Cir.1977); *Van Gemert v. Boeing Co.,* 516 F.Supp. 412, 415 (S.D.N.Y.1981).

mination of the trial court. *E.g., Stanolind Oil & Gas Co. v. Guertzgen*, 100 F.2d 299, 302 (9 Cir.1938); *Tranberg v. Tranberg*, 456 F.2d 173, 175 (3 Cir.1972); *Hoitt v. Vitek*, 495 F.2d 219, 220 (1 Cir.1974); *see* Dawson, *supra*, 88 Harv.L.Rev. at 871.

In *Lindy Bros. Builders, Inc. v. American Radiator & Standard Sanitary Corp.*, 487 F.2d 161 (3 Cir.1973) (*Lindy I*), the Third Circuit voiced dissatisfaction with this method as applied to a situation where the efforts of attorneys retained by some of the plaintiffs in multidistrict antitrust litigation were instrumental in obtaining a large settlement fund which benefitted numerous unrepresented plaintiffs. Chief Judge Seitz stated that in such a case there were two possible bases for awarding attorneys' fees. One basis, exemplified by *Trustees v. Greenough*, 105 U.S. 527, 532–37, 26 L.Ed. 1157 (1882), is the claim of the plaintiffs who brought the underlying suit that they had performed a valuable service for the other plaintiffs by initiating the litigation that led to the creation of the fund and so are entitled to be reimbursed by such plaintiffs for their proportional share of the expenses of litigation, including attorneys' fees. *See Lindy I*, 487 F.2d at 165. The second basis for an award of attorneys' fees, exemplified by *Central R.R. & Banking Co. v. Pettus*, 113 U.S. 116, 5 S.Ct. 387, 28 L.Ed. 915 (1885), is the claim of the attorneys themselves, analogous to an action in *quantum meruit*, that their services had benefitted unrepresented claimants and so entitle them to compensation out of the fund for the benefit thus conferred. *See* 487 F.2d at 165–66. As none of the plaintiffs had sought to recover attorneys' fees, *Lindy I* involved only the second type of award, and it was for this type of award, where there is no established relationship between an attorney and an identified client, that the court prescribed what has come to be known as the "lodestar" method of fee computation. The "lodestar" of the lower courts' fee computation is the hours reasonably spent on the case multiplied by a reasonable hourly rate for the attorney's time. *Id.* at 166–67. After the lodestar has been deter-

mined, the court may take certain other factors into account in order to enhance or diminish the fee award. *Id.* at 167–69. In *City of Detroit v. Grinnell Corp.*, 495 F.2d 448 (2 Cir.1974), this court adopted the *Lindy I* approach; the court made clear that it also was dealing only with cases where an attorney had conferred a benefit upon a class of plaintiffs with whom he had no direct relationship and was seeking fees in his own right. *Id.* at 468–69. The court was equally clear that the primary reason for adopting the lodestar method was the hope that it would produce lower awards of attorneys' fees in cases involving large settlements since previous awards in such cases had tended to be based on a percentage of the recovery. *Id.*

It was natural that the lodestar method should find its way into fee computation under statutes such as 42 U.S.C. § 1988, *see, e.g., Hensley v. Eckerhart*, 461 U.S. 424, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983); *Blum v. Stenson*, 465 U.S. 886, 104 S.Ct. 1541, 79 L.Ed.2d 891 (1984), and § 706(k) of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e–5(k), *see, e.g., Laffey v. Northwest Airlines, Inc.*, 746 F.2d 4 (D.C. Cir.1984). Here too there is no client to put on the brakes since the fees paid by the defendant neither come out of nor reduce the plaintiff's recovery. This also is true in actions under the antitrust laws where there is a private client or a group of clients, since there too the fee is an add-on, and the client has no interest in keeping it within reasonable bounds. *Cf., e.g., Moore v. Jas. H. Matthews & Co.*, 682 F.2d 830 (9 Cir.1982); *In re Fine Paper Antitrust Litig.*, 751 F.2d 562 (3 Cir.1984). Moreover, fee shifting statutes also authorize awards of attorneys' fees in cases involving only injunctive or declaratory relief where the absence of any monetary recovery makes inapplicable other methods of fee computation, particularly the percentage-of-recovery method, which very often had proved to be the basis upon which fees were awarded, 2 Derfner & Wolf, *supra*, ¶ 15.01[1] at 15–4 & n. 5 (citing cases); Dawson, *supra*, 88 Harv.L.Rev. at 876. Finally, the lode-

star method has the advantage of eliminating or at least mitigating the problem involved in plaintiffs' attorneys settling derivative or class actions and seeking to maximize the portion of the total amount paid by defendants that goes to attorneys' fees at the expense of their clients while the defendants simply do not care.

As described above, Judge Lumbard utilized the lodestar method in calculating Massport's recoverable attorneys' fees. Massport argues that, even if it was not improper for the court to question the fees its attorneys were seeking, Judge Lumbard applied this method incorrectly. Specifically, Massport argues that Judge Lumbard erred in making his own determination of the reasonable hourly charges for their attorneys' time; citing *Laffey v. Northwest Airlines, Inc., supra,* 746 F.2d at 24, they contend that the court should simply have accepted the firm's established billing rates. Massport also argues that Judge Lumbard erred in further lowering the lodestar by 25% because in his estimation it was disproportionate to the amount in controversy; relying here on *Hensley v. Eckerhart, supra,* 461 U.S. at 434–37, 103 S.Ct. at 1940–42, Massport maintains that the lodestar should only be lowered to reflect less than complete success on the merits whereas they were "entirely successful." Finally, citing *New York Ass'n for Retarded Children, Inc. v. Carey,* 711 F.2d 1136 (2 Cir.1983), Massport argues that it was improper to consider the rates charged for its attorneys' services at the outset of the suit and that the court should have used the attorneys' current billing rates.

■ Although Judge Lumbard relied on techniques used in the lodestar method, he was not required to do so in fixing fees under a contract of indemnity. Certainly he was not required to apply that method

precisely as it has been developed in the context of fee awards made pursuant to statute.[6] Massport's lawyers seek to mandate strict application of the lodestar method—with all the refinements annexed to it in subsequent cases—to run-of-the-mill indemnity actions. They would extend a method developed for determining fee awards in some special categories of cases into an overarching principle, requiring its application to any case where one party is bound to pay the attorneys' fees of another. We see no sufficient reason to mandate application of the lodestar method in a case like this one, where the fee is not "court awarded" in the sense of imposing an obligation, but is rather a filling in of the terms of a contract. In such a case, the court's task, as previously pointed out, is to make its best guess as to what the paying party actually would have had to pay.

■ Nevertheless, we find the course followed by Judge Lumbard in carrying out this task to have been reasonable and for this reason affirm his award to Massport of fees from the merits trial. The hours-times-rate formula gives some indication of what the receiving party would ask, although it does not always measure what the paying party would finally agree to pay if payment were to be from its own funds. Judge Lumbard was thus justified in using the lodestar as a starting point, although he was not required to do so. He was also justified in scaling down the hourly rates of Massport's attorneys on the basis of their experience and the firm's overhead, both of which are certainly important considerations to a client. He was similarly justified in further scaling down the amount produced by the lodestar method because it was disproportionate to the amount at stake.[7]

**6.** We thus express no view as to the requirements for computing fees in that context.

**7.** We attach little importance to the fact that Massport's underwriter, knowing that it would not have to pay any bill from Massport's attorneys, stated that the attorneys' unreduced charges were "fair and reasonable."

Massport also argues that its fees were not disproportionate because, while the claim was for $30,000, the judgment actually paid by Italian Line was $47,136. The difference represents three years interest of just under $13,000 plus costs of some $4,200. Interest is hardly a factor since it represents the use of money which, by hypothesis, was not properly Italian Line's or Massport's. Judge Lumbard was justi-

The amount in controversy continues to be an important consideration; we cannot imagine, for example, that if the amount sought by Peter Fabrics had been only $10,000, Massport would have paid its attorneys, or even that its attorneys would have asked, that Massport should pay, the amount of $28,958 requested here. In awarding fees in a case like this, judges may draw on their own experience as practitioners and on common sense. Judge Lumbard, who after all had some experience in sending out bills although in less palmy days, was thus justified in concluding that "prudent counsel" would not ask his client to pay $28,958 to prevent a judgment for only $30,000, "absent unusual circumstances" determined not to be present here, and in lowering the fees as he did.[8]

The judgment must be modified to disallow fees awarded for time spent by Massport in proving its indemnity claim. This includes the entire award in connection with the damages trial. In addition, it appears from the affidavits of services submitted by Massport's counsel and the other evidence before the district court that some of the time compensated in connection with the merits trial related to the indemnity claim. Disallowance of this time and recalculation of the fee award on the same basis as Judge Lumbard employed leaves a total recovery to Massport of $15,756.56.

The judgment is modified as indicated and, as so modified, is affirmed. No costs.

---

fied in appraising what Massport would have considered to be the amount of its exposure as $30,000.

**8.** Massport argues that it was reversible error for the court to refuse to permit it to discover the attorneys' fees paid by Italian Line to its lawyers. Although this information "was relevant, and arguably even helpful," *In re Fine Paper Antitrust Litig., supra,* 751 F.2d at 587 (citing cases), it was not an abuse of the judge's discretion in controlling discovery to deny Massport's request since there was adequate evidence presented with which to make the determination of the reasonableness of the fees sought. *Id. See generally* 4 Moore's Federal

---

Practice ¶ 26.83[10] (1984) (discussing scope of appellate review of discovery orders).

We also agree with the court below that the statement of counsel for Italian Line at the outset of the damages trial that "I don't argue about the hourly rate of their services" was not an effective waiver of Italian Line's right to challenge the reasonableness of the rates. This statement was made before Italian Line had obtained discovery from Massport's attorneys; it was only after obtaining the attorneys' records that Italian Line found several bases on which to attack the rates. Massport had plenty of time to meet this attack and neither relied on nor was prejudiced by this earlier statement.