Donald A. **FLUNKER**, Plaintiff,

v.

**UNITED STATES of America,** Defendant-Appellee,

**and**

**States Line, Defendant-Appellant.**

No. 74–2590.

United States Court of Appeals, Ninth Circuit.

Nov. 24, 1975.

M. Bayard Crutcher (argued), of Bogle & Gates, Seattle, Wash., for appellant.

William E. Gwatkin, III (argued), of Admiralty & Shipping Sec., San Francisco, Cal., for appellee.

## OPINION

Before KOELSCH and HUFSTEDLER, Circuit Judges, and SMITH,* District Judge.

HUFSTEDLER, Circuit Judge:

States Steamship Co. ("States") appeals from a judgment for the United States on States' cross-complaint for indemnity for payments it made to or in respect of its seaman, Flunker, who was injured by the Navy's negligence.

Flunker was a steward aboard the SS "Hawaii," a ship owned and operated by States. On June 27, 1971, the Hawaii was at anchor awaiting pratique at the United States Naval Base at Subic Bay, Philippines. Flunker, who had shore leave, boarded a Navy landing craft for the trip to shore. The landing craft was available for the use of all the ships anchored in Subic Bay. Due to a malfunction in the linkage of the landing craft's port engine, the engine would not back down, and the craft collided with a dock at the Base. The impact caused Flunker to fall into the deck well and break his elbow. States paid the following sums to Flunker or because of his employment contract: $1134.00, unearned wages at the end of the voyage; $728.00, maintenance; $945.61, repatriation expense from Manila to Seattle; $1389.53, to pension and fringe benefits funds pursuant to labor union agreements covering Flunker's employment; and $96.19, taxes. It also spent money defending Flunker's action for damages against it.

At the time of the injury, States was under an affreightment contract with the Government to deliver certain cargo to the Base at Subic Bay. According to the contract, when States' vessels were required to call and load and discharge cargo at Government facilities, the Government would provide necessary husbanding services, for which States was to pay in accordance with schedules established by the government agency operating the facilities concerned. States paid the Government $22.42 for boat services furnished by the Government on June 27, 1971.

Flunker sued the Government for both negligence and unseaworthiness of the landing craft and States for unseaworthiness of the "Hawaii." He claimed $21,000 for injuries, lost wages, pain and suffering and medical expenses. The Government compromised and settled the suit for $7500. Part of the compromise was an agreement that Flunker would dismiss his suit against States with prejudice. States seeks indemnity from the Government for its expenditures.

States offered a tort theory and a warranty theory to sustain its indemnity action against the Government. Because we conclude that the Government is liable under warranty, we do not reach the tort theory. States asserts that as a part of its affreightment contract with the Government, and possibly due to the unique conditions at Subic Bay, there

---

* Honorable Russell E. Smith, Chief Judge, District of Montana, sitting by designation.

was an express or implied contract that the Navy would furnish launch service to shore. Accordingly, the Government owed States an implied warranty of workmanlike performance. The Government breached that warranty by its negligence and must thus indemnify States.

This case presents facts which are in the twilight area between *United States v. Tug Manzanillo* (9th Cir. 1962) 310 F.2d 220 and *United States v. Gallagher* (9th Cir. 1972) 467 F.2d 1103. In *Manzanillo*, the Government had contracted with a towing company to tow the Government's vessel, and, thereafter, according to custom, one of the tugs took ashore the ship's master. The master was injured on one of these trips to shore, and the Government paid him maintenance and cure. We affirmed the district court's grant of indemnity to the Government on the ground that the tug company's contractual obligation involved a warranty of workmanlike service that the tug company had breached. (310 F.2d at 222.) In *Gallagher*, a Government seaman had been injured in a shore accident by the negligence of a taxi driver. The Government sought indemnity from the taxi driver to repay it for the maintenance and cure payments it had made to the seaman. The Government and the taxi driver were total strangers, and the accident had nothing to do with the activities of the vessel on which the seaman served.[1] We refused to grant indemnity. The district court concluded that *Flunker* was more analogous to *Gallagher* than to *Manzanillo* because here the Government did not have an express contract with States to transport the crew to shore. We think that *Flunker* is much closer to *Manzanillo* than to *Gallagher* because of the multiple relationships of States to the Government.

■■■ The doctrines of maintenance and cure and of unseaworthiness have been developed to give seamen no-fault damage recovery in recognition of the dangerous character of their work and their quasi-captive status during their voyage (G. Gilmore & C. Black, The Law of Admiralty, 281, 393 (1975)). Maintenance and cure is the implied contractual right of a seaman, taken ill or injured while in the service of the ship, to payments through the time of maximum recovery (*Id.* at 299), and wages through the end of the voyage (*Id.* at 309). The owner's warranty of seaworthiness gives the seaman recovery in the event of injury because of the physical condition of the ship or "operating negligence." (*E. g., Seas Shipping Co. v. Sieracki* (1946) 328 U.S. 85, 66 S.Ct. 872, 90 L.Ed. 1099; *Mahnich v. Southern S.S. Co.* (1944) 321 U.S. 96, 64 S.Ct. 455, 88 L.Ed. 561; *The Osceola* (1903) 189 U.S. 158, 23 S.Ct. 483, 47 L.Ed. 760; G. Gilmore & C. Black, *supra*, at 384.)

The doctrine of unseaworthiness imposes a heavy burden on shipowners, who often are held vicariously liable for the acts of third persons causing injury to seamen, and under *Sieracki, supra*, to a longshoreman as well. To ease that burden the Supreme Court, in *Ryan Stevedoring Co. v. Pan-Atlantic S.S. Co.* (1956) 350 U.S. 124, 76 S.Ct. 232, 100 L.Ed. 133, developed a theory of indemnification of the shipowner to permit recovery over against a third person for breach of the warranty of workmanlike performance. (*Italia Societa v. Oregon Stevedoring Co.* (1964) 376 U.S. 315, 84 S.Ct. 748, 11 L.Ed.2d 732; *Stranahan v. A/S Atlantica & Tinfos Papirfabrik* (9th Cir. 1975) 521 F.2d 700; *see also Fairmont Ship Corp. v. Chevron Int'l Oil Co., Inc.* (2d Cir. 1975) 511 F.2d 1252, 1255–59; *Lusich v. Bloomfield S.S. Co.* (5th Cir. 1966) 355 F.2d 370, 377 nn.5–6 and cases cited therein. In 1972, Congress eliminated the doctrine for longshoremen, 33 U.S.C. § 905(b), but the ration-

---

1. We relied, in part, on the reasoning of The Federal No. 2 (2d Cir. 1927) 21 F.2d 313. We are aware that *The Federal No. 2* does not sail in untroubled waters. The Third Circuit has flatly rejected it (*Jones v. Waterman S.S. Co.* (1946) 155 F.2d 992), and the Second Circuit itself may be prepared to scuttle it (*Mahramas v. American Export Isbrandtsen Lines, Inc.* (1973) 475 F.2d 165, 170 n.7).

ale and holdings retain vitality for seamen.) The purposes of the doctrines of unseaworthiness and indemnification are not only to shift losses but also to place ultimate liability on the party who was truly at fault and who should mend his negligent ways to prevent future injury.[2]

The *Ryan* court noted that "[c]ompetency and safety of stowage are inescapable elements of the service undertaken. . . . It is the essence of petitioner's stevedoring contract. It is petitioner's warranty of workmanlike service that is comparable to the manufacturer's warranty of the soundness of its manufactured product." 350 U.S. at 133–34, 76 S.Ct. at 237. (*See Italia Societa, supra.*) *Ryan* has developed in two directions. It now covers cases where the potential indemnitor is not a stevedore (*United States v. San Francisco Elevator Co.* (9th Cir. 1975) 512 F.2d 23, 26, 27; *see, e. g., United New York Pilots Ass'n v. Rodermond Ind.* (3d Cir. 1968) 394 F.2d 65, 71 (electrical repairs); *Fairmont Ship. Corp., supra,* 511 F.2d at 1258 n.10 and *The Tug Manzanillo, supra* (towing); *see Tebbs v. Baker-Whitely Towing Co.* (4th Cir. 1969) 407 F.2d 1055, 1058 n.1 for other cases). But most importantly for present purposes, it comprehends situations where there is no contractual relationship between indemnitor and indemnitee. (*Waterman S.S. Co. v. Dugan & McNamara, Inc.* (1960) 364 U.S. 421, 424–25, 81 S.Ct. 200, 5 L.Ed.2d 169; *see also Crumady v. The J. H. Fisser* (1959) 358 U.S. 423, 79 S.Ct. 445, 3 L.Ed.2d 413; *San Francisco Elevator Co., supra.*)

If the covenant were limited to the cases in which an express contract exist-ed between the indemnitor and the indemnitee to do the act or to furnish the article from which the injury arose, its beneficient purposes would be severely curtailed. Strict contractual privity would frustrate the utility of the workmanlike performance warranty, permitting a breaching party to avoid paying indemnity in situations where workmanlike performance had been relied upon by the party primarily liable, but fortuitously there was no contract between the shipowner and the third party. Relaxing the privity constraint in this circumstance is analogous to its relaxation in the case of a manufacturer's warranty. On the other hand, to imply a covenant of workmanlike performance in favor of a claimed indemnitee, who is a total stranger to the shipowner and whose activities are unrelated to the ship, unmoors the theory from the unseaworthiness doctrine from which it sprung and potentially allocates losses to parties unrelated to the shipping enterprise, which losses neither party could reasonably have contemplated.

■ The appropriate course is to require that, in the absence of express contract, a covenant of workmanlike performance will not be implied in favor of a shipowner unless there is a relationship between the tortfeasor and the shipowner in the context of shipping that makes the implication reasonable.[3]

We assume without deciding that the Government's contentions are well taken that its contract of affreightment did not contain any covenant of workmanlike performance[4] and that "husbanding

---

2. "The function of the doctrine of unseaworthiness and the corollary doctrine of indemnification is allocation of the losses caused by shipboard injuries to the enterprise, to the institution or institutions most able to minimize the particular risk involved." *DeGioia v. United States Lines Co.* (2d Cir. 1962) 304 F.2d 421, 426.

3. Most cases to date have implied such a warranty only when the shipowner owes a non-fault duty to the plaintiff. (*See Fairmont Ship. Corp., supra,* 511 F.2d at 1258 n.11.) We do not need to decide whether the warranty of workmanlike service extends beyond non-fault situations.

4. The Government analogizes an affreightment contract to a time charter, citing cases stating that covenants of workmanlike performance are not imposed on time charterers. (*D/S Ove Skou v. Hebert* (5th Cir. 1966) 365 F.2d 341; *McNamara v. Weichel Dampfschiffahrts AG Kiel, Germany* (2d Cir. 1964) 339 F.2d 475.) Affreightment contracts that give the shipper no operational control of the vessel are similar

services," which the Government contracted to furnish to States do not include ship-to-shore transportation of the crew. (*See, e. g., The Hinkins S.S. Agy. v. Freighters, Inc.* (9th Cir. 1974) 498 F.2d 411.) That assumption does not resolve the issue because we do not treat the affreightment contract as the source of the implied covenant, but only as one of the elements of the relationship from which the covenant is implied.

■ In addition to the affreightment contract, there was a course of dealing between the Navy and States which shows the symbiotic relationship between the two in respect of the launch service. No crewman could reach the shore legally other than by the Navy's launch. The launch made several trips daily to provide service to vessels anchored in Subic Bay. The same service had been supplied to States' vessel on prior occasions. If there were defects and deficiencies in the launches or the launch crew, the Navy, not States, was in a position to minimize or to cure them. The operation of the launch was closely related to the performance of States' cargo shipping contract, even though the contract contained no express provision for the service. We therefore conclude that the case is more analogous to *Manzanillo* than to *Gallagher,* and we impose a warranty of workmanlike performance on

the Government in States favor.[5] The Government breached its warranty, and States is entitled to indemnity.[6]

■ The Government argues that it paid Flunker for the very items for which States seeks reimbursement and that if we compel it to indemnify States, it would be required to pay twice, contrary to the teaching of *Gallagher, supra,* 467 F.2d at 1105. The Government points to its settlement agreement with Flunker whereby it paid him $7500, and Flunker agreed to dismiss his $21,000 damage action against the Government and States. Flunker signed a release reciting that the payment was to "discharge and satisfy any claims that plaintiff Flunker has or may have against the United States for loss of earnings, medical expenses of any sort, maintenance and living expenses while unfit for duty or otherwise, return transportation expenses, and any other elements of damages which he may be entitled to recover from the United States by reason of matters alleged in his complaint in this matter."

States was not a party to that contract. To the extent that any part of the settlement included payments for which States claims indemnity, the Government was discharging its own liability to Flunker. It was not thereby discharging any liability that it had to

to time charters in which the charterer likewise has no operational control over the vessel.

5. It is on this point that we distinguish *Isham v. Pacific Far East Line, Inc.* (9th Cir. 1973) 476 F.2d 835. Isham was a passenger on a cargo ship who was injured under a situation very similar to that in the present case. Her injury occurred at an intermediate stop on a voyage; the ticket had said there was no provision for going ashore at this place. She sued the shipping line and recovered. On appeal, we reversed because the line owed her no duty to provide transportation to shore and thus could not have breached the duty. In the present case, Flunker's recovery was not for a breach of duty in the tort sense, but arose automatically out of his contract without any negligence on States' part.

6. *Davis v. Chas. Kurz & Co.* (9th Cir. 1973) 483 F.2d 184 does not help the Government.

Davis was an employee of a subcontractor doing repairs on a vessel in drydock. He was injured when a hatch cover fell on him. Chas. Kurz & Co., the shipowner, had no warranty of seaworthiness in respect of this "dead vessel"; it owed no duty to Davis that resembles the duty of a shipowner to a seaman. The injury was caused by the negligence of Davis' employer, Pacific, the subcontractor. In holding that no warranty of workmanlike service ran from Pacific to the general contractor, we noted that the warranty of workmanlike service was pinned to the existence of absolute liability of the shipowner to the seaman (in this instance seaworthiness) and without any basis for absolute liability, the implied warranty of workmanlike service could not arise.

The facts are entirely different in *Flunker,* and States did owe Flunker a non-fault duty to pay him maintenance and cure.

States or that States had to Flunker for these items. (*Id.* at 1104.) When it entered a bilateral agreement with Flunker, the Government assumed the risk of double recovery in the event of indemnification.

Flunker sought general and special damages from both the Government and States. Although Flunker could not sue the Government for maintenance and cure or any of the other contractually-based obligations, he could potentially recover from the Government the same items as elements of special damage. (*Gypsum Carrier, Inc. v. Handlesman* (9th Cir. 1962) 307 F.2d 525, 533.) The Government could not deduct from any award of damages to Flunker payments that States made to him. The collateral source rule forbids the deduction. (*Id.* at 534.) The Government's theory is that it is made to pay twice if it has to pay both Flunker and States. That argument assumes that some part or all of the $7500 was attributable to the items for which States now seeks reimbursement. The Government's language in the release seems designed to carry that message, but does it succeed? We think not. The release does not allocate the sums paid in settlement. The Government may have paid all or any part of the whole sum to discharge its potential liability for general damages. The Government had the burden of showing that it paid twice because it is relying on double payment as a means of defeating liability to indemnify.

In *Gallagher*, we applied the general rule that equitable indemnity will not be used to force a tortfeasor to pay twice, and we put the burden on the party claiming indemnity to prove that the tortfeasor had not therefore paid. Here, we put the burden on the tortfeasor, the Government, to prove that it had earlier paid. The Government loses both cases because each rests on a different indemnity theory, and the equitable considerations are strikingly different in the two cases.

In *Gallagher*, the sole predicate for indemnity was the Government's claim that the tortfeasor would be unjustly enriched if he were not compelled to reimburse the Government. The only proof that the Government offered to show that the tortfeasor had paid less than he justly owed was the opaque settlement agreement that he had entered into with the seaman. But the agreement could as easily have included as excluded full payment for the special damages. An agreement whereby the tortfeasor fully paid special damages to the injured person could not be the basis for an equitable claim for reimbursement for the same payments to the Government. The Government had the burden of proving the allocation of the lump sum settlement because it offered no other evidence to prove its unjust enrichment theory.

The situation is different in this case. Here, the predicate for indemnity is breach of the implied warranty of workmanlike service. The Government seeks to defeat liability on the ground that it would be inequitable to require it to reimburse States. The asserted inequity would result from indemnifying States for items the Government had paid when it settled with Flunker. Therefore it has the burden of proving how much of the $7500 was attributable to special damages, which can be translated into the payments for which States seeks reimbursement. The Government has not carried its burden.

■ Even if we assume, *arguendo*, that part of the settlement should be attributable to maintenance and cure, the Government would not necessarily avoid indemnity. The doctrine of equitable indemnification exists properly to allocate damage recovery among parties who are not equally at fault. (*See United Air Lines, Inc. v. Wiener* (9th Cir. 1964) 335 F.2d 379, 398–99.) In order to avoid unjust enrichment of the tortfeasor, the doctrine makes him pay for the injury which has made another liable. *Gallagher* is an exception to the general rule. There was no relationship between the parties. Additionally, the Government had refused to submit to

jurisdiction in a state court when the injured seaman sued Gallagher in tort. Gallagher thus had to bear the burden of defense himself, and it would have been unfair to permit the Government to obtain indemnity.

The present case differs from *Gallagher*. The Government was the tortfeasor and it did have a close relationship with States. Also, States was a codefendant, incurring expenses to fight Flunker's suit. The Government avoided its responsibilities for a time. Informed of Flunker's injury and States' denial of liability almost from the day of the tort, it might have entered a tripartite agreement with States and Flunker. Instead, it waited until sued and then settled with Flunker on a bilateral basis. The Government's equities are therefore inferior to States' and this case falls within the general rule allowing indemnification.

■ The Government does not dispute States' entitlement to reimbursement for the funds paid directly to Flunker if it loses on the liability issue. However, it argues that, even if it must indemnify, it should not be obliged to repay funds that States paid as a result of Flunker's employment to the pension funds, or taxes, or to reimburse States for its litigation expenses in defending Flunker's action against it.

Payments to pension funds pursuant to a contract between Flunker's union and States are not "wages" to Flunker (*Branden v. Denton* (5th Cir. 1962) 302 F.2d 404. *See also Barnouw v. S.S. Ozark* (5th Cir. 1962) 304 F.2d 717.) But they are expenditures by States which States was contractually bound to pay to the Union, and the amount of those payments is directly related to the length of Flunker's service aboard the "Hawaii." Taxes are similar in that States was bound by law to pay the taxes, and moreover they are directly related to the amount of Flunker's wages. We think that both of these items are so inextricably bound to Flunker's employment relationship to States that for indemnification purposes, they ought to be reimbursed.

■ In general, courts allow indemnitees to collect from the indemnitor reasonable and necessary counsel fees and legal expenses incurred in defending against the plaintiff. (*United States v. San Francisco Elevator Co., supra*, 512 F.2d at 28; *Lusich v. Bloomfield S.S. Co., supra*, 355 F.2d 776; *Grigsby v. Coastal Marine Serv.* (W.D.La.1969) 317 F.Supp. 1113, 1115. *See generally* 42 C.J.S. Indemnity § 13d, at 586; 41 Am. Jur.2d Indemnity § 36, at 725–26.) The award of fees and expenses does not encompass costs necessary to establish the right against the alleged indemnitor. (*Lusich, supra*, 355 F.2d at 776; *General Electric Co. v. Mason & Dixon Lines, Inc.* (W.D.Va.1960) 186 F.Supp. 761, 776; *Williams v. The California Co.* (E.D.La. 1968) 289 F.Supp. 376, 380.)

■ The Government asserts that it is not liable for attorney's fees and legal expenses here because States did not tender it the defense. (*Tankrederiet Gefion A/S v. Hyman-Michaels Co.* (6th Cir. 1969) 406 F.2d 1039, 1043–44.) It claims that since it spent money to defend against Flunker's charges there would be an inequity in making it pay States, in effect making it pay twice for the same thing. While tender of the defense is one way to achieve fairness to the indemnitor, it is not the only way. (*See Parfait v. Jahncke Serv., Inc.* (5th Cir. 1973) 484 F.2d 296, 304.) However, we do not find it necessary to decide whether tender was essential here.

The Government's duty to indemnify States is predicated on the latter's absolute duties to Flunker and the various funds. States seeks legal expenses not with respect to these duties but for its defense against Flunker's unseaworthiness claim. Any recovery based on unseaworthiness would have been distinct from the maintenance, cure, and wages paid. Further, any unseaworthiness of the Navy's launch would not have rendered the "Hawaii" unseaworthy. (*See Victory Carriers, Inc. v. Law* (1971) 404

U.S. 202, 213–14, 92 S.Ct. 418, 30 L.Ed.2d 383.) The Government need not pay indemnification where its acts would not have made States vicariously liable to a seaman.[7]

Reversed with directions to enter judgment for States in the amount of States total payments for maintenance and cure, wages, repatriation expenses, pension and fringe benefit funds, and taxes.

RUSSELL E. SMITH, District Judge (concurring):

I concur in the result.

It is conceded that there was a contract whereby the United States for a consideration agreed with States Line to furnish ship-to-shore transportation for the States Line crew aboard the SS *Hawaii.* It is likewise conceded that the negligence of the United States resulted in Flunker's injury.

It was an implied term of the contract to furnish transportation to the States Line crew that the United States would use reasonable care in furnishing that transportation, *i. e.,* it would transport members of the SS *Hawaii* crew without negligence. It was because of the failure of the United States to do the exact thing it had contracted to do that Flunker was injured. There was a breach of an obligation not only to Flunker but to States Line as well, and out of those breaches the duty to indemnify arose. I think it unnecessary to go further.

---

**7.** *San Francisco Elevator Co., supra,* and *Arista Cia. DeVapores v. Howard Terminal* (9th Cir. 1967) 372 F.2d 152 are not to the contrary. In the first case, the indemnitee was found to have had an unseaworthy vessel as a result of the indemnitor's acts; in the latter case, the negligence of the indemnitor's own workman resulted in a meretricious claim against the indemnitee, a breach of the warranty of workmanlike performance, and liability for counsel expenses for the indemnitee's successful defense.