Charles SEMENTILLI, Plaintiff,

v.

TRINIDAD CORPORATION, Defendant.

TRINIDAD CORPORATION, Third–
Party–Plaintiff–Appellant,

v.

Stephen H. TAUS, Third–Party–
Defendant–Appellee.

No. 96–16034.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Dec. 9, 1997.

Decided Sept. 16, 1998.

As Amended Nov. 12, 1998.

Norman J. Ronneberg, Rice, Fowler, Booth & Banning, San Francisco, California, for third-party-plaintiff-appellant.

Stephen W. Cusick; Thomas H. Nienow, Wright, Robinson, Osthimer & Tatum, San Francisco, California, for third-party-defendant-appellee.

Before: BRIGHT,* FLETCHER, and T.G. NELSON, Circuit Judges.

Per Curiam Opinion; Concurrence by Judge T.G. NELSON; Dissent by Judge FLETCHER.

* Honorable Myron H. Bright, Senior United States Circuit Judge for the Eighth Circuit Court of Appeals, sitting by designation.

PER CURIAM.

Trinidad Corporation filed an indemnity action in admiralty against Stephen H. Taus, M.D., to recover the damages it incurred when Charles Sementilli, a crewman aboard its vessel, was injured. The district court granted summary judgment in favor of Dr. Taus, finding that Trinidad had failed to present evidence to show that Dr. Taus's alleged misconduct was the proximate cause of the injury suffered by Trinidad. We have jurisdiction under 28 U.S.C. § 1291. We reverse.

## I.

Dr. Taus began treating Charles Sementilli in 1986 for a variety of physical and psychological complaints arising from an on-the-job conveyor belt accident. As a result of this accident, the physical requirements of Sementilli's job as an onshore cookie baker, as well as Sementilli's chronic depression, bursitis, tendinitis and hypertension, Dr. Taus determined Sementilli to be completely disqualified from working as an onshore baker.

In May 1990, Dr. Taus declared Sementilli to be *totally and permanently disabled* from the baking profession and incapable of doing any other job requiring Sementilli to lift weights of more than ten to twenty pounds. Dr. Taus also advised that Sementilli should avoid future jobs which would require him to jump, run, climb, lift, or stand for extended periods, or which involved cold, wet, noisy or vibrating working conditions. Despite this advice and his declaration that Sementilli was totally disabled, Dr. Taus encouraged Sementilli to become a merchant seaman on a U.S. flag vessel.

On October 24, 1990, Dr. Taus issued a medical slip to the National Maritime Union ("NMU" or "union") stating that Sementilli was fit for sea duty. Dr. Taus issued this medical slip despite his knowledge that an ordinary part of a seaman's job is climbing ladders, lifting heavy weights and working long hours without rest and under adverse conditions. Several days before *and again sixteen days after* sending this "fit-for-duty" evaluation to the union, Dr. Taus formally advised Sementilli's private disability insurer that Sementilli was *still* totally disabled due to chronic depression, tendinitis, bursitis and hypertension.

Sementilli obtained his first sea billet aboard the U.S. flag vessel USNS AGENT, working from December 1990 through March 1991. Dr. Taus continued to produce reports stating that Sementilli was totally disabled from working as an onshore baker during this time period despite the fact that Sementilli was engaging in extremely heavy manual labor aboard the AGENT. As soon as Sementilli left the AGENT, he again sought medical treatment from Dr. Taus for various physical conditions, including low back pain. On May 20, 1991, Dr. Taus diagnosed Sementilli as suffering from low back sprain and left hip arthritis.

Approximately one month later, Trinidad needed a seaman for the S.S. ADMIRALTY BAY. Under a contract between Trinidad and the union, Trinidad was required to hire its seamen from the NMU hall. Furthermore, under the contract, Trinidad was required to hire any qualified seaman sent to it by the union. If Trinidad wanted to ensure that a seaman sent to it by the union was physically fit to carry out the rigorous duties of a merchant mariner, Trinidad could require the seaman to be examined by the union-designated physician for the area.

In response to Trinidad's request for a seaman, the union sent Sementilli. Prior to employment, Trinidad required Sementilli to undergo a physical examination to ensure that he was physically fit for duty at sea. To fulfill this requirement, Sementilli was examined by Dr. Taus, the union-designated physician for the area. Dr. Taus knew that the preemployment physical was a precondition to Sementilli obtaining a position as a merchant seaman aboard Trinidad's vessel, and that Sementilli would not be allowed to ship out on Trinidad's vessel unless certified as fit-for-duty.

After an examination, Dr. Taus certified Sementilli as fit-for-duty by designating Sementilli as "accepted" on the preemployment physical examination form. This form, signed by Dr. Taus as the "examiner," also stated that Sementilli had *never* suffered from any previous injuries, back complaints, depression or nervous troubles.

Sementilli presented this preemployment examination form, with its fit-for-duty certifi-

cation, to the master of the ADMIRALTY BAY and was accepted for employment aboard the vessel. Without this fit-for-duty certification, Sementilli would not have been hired to work on the vessel. Furthermore, had Trinidad known that Sementilli had been declared permanently disabled from working as a shoreside baker, and had a long history of psychological and orthopedic complaints, it would not have hired him to serve aboard its vessel.

On July 5, 1991, only five days after shipping out on the ADMIRALTY BAY, Sementilli slipped and fell on a rug as he stepped out of the vessel's elevator. At the time of the accident, Sementilli was stepping out of the elevator carrying a tray of frozen meat weighing approximately fifty pounds. When he placed his foot on the rug in front of the elevator, which had been placed on the floor upside-down so that the rubber nonslip backing was facing up instead of down, it slipped out from under him and he fell.[1] As a result of the fall, Sementilli allegedly suffered renewed back pain and severe depression. Dr. Taus has declared that, as a result of these

injuries, Sementilli is permanently disabled from future sea duty.

Sementilli filed suit against Trinidad for the back and psychiatric injuries he allegedly sustained as a result of the slip and fall, seeking damages in excess of $1,500,000 pursuant to the admiralty remedies of maintenance and cure, Jones Act (46 U.S.C. § 688) negligence and unseaworthiness. Trinidad and Sementilli settled the action for $75,000.

Trinidad then impleaded Dr. Taus, seeking indemnity from him on the grounds that Dr. Taus had negligently and wrongfully certified a person known to him to be already permanently disabled as fit-for-duty as a merchant seaman; that Dr. Taus had knowingly deceived Trinidad as to Sementilli's true physical condition; and that Trinidad had relied on Dr. Taus's certification in hiring Sementilli. Trinidad sought indemnity for the costs of the settlement with Sementilli, as well as for the shipowner's maintenance and cure obligations. Trinidad proceeded under several different legal theories, including negligence, breach of the maritime warranty of

---

1. Sementilli's testimony varies on the story behind why the rug was placed upside-down. At one point he says that the chief steward placed the rug upside-down after cleaning it; that Sementilli was "going to question him about that because it was unusual" but that "things got real busy right then and there, and I was unable to ask him and the question never came up afterwards"; and that he had never "discussed that rug with anybody on the ship before [his] accident" other than being told to move it while mopping and sweeping and to replace it where it was afterwards.

At another point, Sementilli answered, in response to the question of whether he ever asked the chief steward if he could turn the rug back to its proper position with the rubber side down:

Not after I heard him mention to Emanuel that he wanted it that way. Well, he mentioned that to me, that he wanted it that way. Keep it upside down. But I had my mind on so many duties I did not-I was not concentrating on asking him why.

At still another point, Sementilli testified as follows:

Q. Did [the chief steward] tell you that he was putting the rug down rubber side up for a reason?
A. I can't remember.
Q. At any time in the two or three days before your accident, did anybody aboard the ship ever comment on or discuss that rug?
A. I don't remember.

Q. Did you ever talk to the chief steward or anyone else in the steward's department about the rug being upside down prior to your accident?
A. I don't remember if I did or I didn't.

Viewing the evidence in the light most favorable to Trinidad, as we must on summary judgment, a reasonable fact-finder could infer that Sementilli did not ever hear or ask why the rug was upside-down. Furthermore, the fact remains that as part of Sementilli's job, he was required to mop in front of the elevator. To complete this task, he had to move the rug and mop underneath it. So, for the two or three days between the time the rug was allegedly placed upside-down by the chief steward and the accident, Sementilli himself moved the rug and replaced it several times.

Finally, when asked whether he realized or thought that having the rug upside-down constituted a dangerous condition, Sementilli responded:

No. It was kind of baffling. Not-I didn't think of it as dangerous, but I just wondered if I thought he might have wanted to keep the top clean or something like this, cleaner for a longer length of time, to myself. But there were so many duties that I had to learn how to do, how things were-my mind was so occupied.

workmanlike service, negligent misrepresentation and fraud.

Dr. Taus moved for summary judgment, arguing that he was entitled to judgment as a matter of law because Trinidad could not show that the injury it suffered was proximately caused by Dr. Taus's certification of Sementilli as fit-for-duty. The district court granted Dr. Taus's summary judgment motion. Although the district court found Dr. Taus's certification of Sementilli to have been the "undisputed" cause in fact of Trinidad's injuries, it found that Trinidad had failed to present evidence sufficient to show that the certification was the proximate cause of Trinidad's injuries. In making this finding, the district court excluded from consideration the declaration of Trinidad's expert, Smith A. Ketchum, M.D. Trinidad timely appeals.

## II.

We review a grant of summary judgment *de novo*. *Bagdadi v. Nazar*, 84 F.3d 1194, 1197 (9th Cir.1996). We review the district court's decision to exclude evidence in deciding a summary judgment motion for an abuse of discretion. *General Elec. Co. v. Joiner*, —— U.S. ——, ——, 118 S.Ct. 512, 519, 139 L.Ed.2d 508 (1997).

## III.

To · establish the element of causation, Trinidad offered the declaration of Dr. Ketchum. Dr. Ketchum stated in this declaration that he had reviewed Sementilli's medical records maintained by Dr. Taus. Dr. Ketchum then summarized his findings, based on his review of these records: that, as recently as May 20, 1991, Sementilli had been diagnosed as suffering from low back sprain and left hip arthritis; that since 1988, Dr. Taus had diagnosed Sementilli as suffering from swollen ankles, gout, acute gout, and left and right ankle sprain on more than twenty occasions; that Sementilli had suffered from depression, anxiety and nervous troubles since 1985; that Dr. Taus had declared Sementilli permanently disabled from working as a shoreside baker due to bursitis, tendinitis, hypertension and depression; and that Dr. Taus had disqualified Sementilli from jobs involving lifting weights in excess of twenty pounds, jumping, running, climbing, crawling, or working conditions that were noisy, subject to sudden temperature changes or which involved cramped quarters, high places or vibrations.

Dr. Ketchum then opined, based on his review of Sementilli's medical records and his knowledge, experience, training and education, that the functional job requirements for a steward/seaman in the U.S. merchant marine are greater than those required for a shoreside baker; that a person permanently disabled from a shoreside baker's job is not fit for duty as a seaman; that a seaman must be able to show "emotional adaptability for employment in the maritime environment"; that, given Sementilli's lengthy and chronic depression and chronic anxiety, he was a psychological "accident waiting to happen" and should have been disqualified for sea duty; that the working conditions which Sementilli was barred from by Dr. Taus-lifting more than twenty pounds, jumping, running, climbing, crawling, cramped quarters, high places, vibrations, noise and an environment subject to sudden temperature changes-are necessarily conditions that a seaman will be subject to when working aboard a ship; that Sementilli was in very poor psychological and physical condition and was likely to sustain injury aboard a vessel, irrespective of any fault on the part of the ship owner; that "Sementilli's slipping accident could well have been caused-at least in part-by the instability and physical limitations created by [his] pre-existing orthopedic problems (i.e., chronic ankle swelling, shoulder complaints, low back pain, etc.)"; and that "Sementilli's pre-existing history of anxiety, 'nerves' and depression (which quite probably gave rise to 'difficulty in thinking' and 'psychomotor retardation') may well have caused or contributed to Mr. Sementilli's slip-and-fall accident aboard the vessel."

The district court excluded Dr. Ketchum's declaration from consideration because it found Dr. Ketchum's opinion to be "pure speculation." We review the district court's decision to exclude this evidence for an abuse of discretion. *See General Elec.*, —— U.S. at ——, 118 S.Ct. at 519.

The district court listed three reasons for its finding of inadmissibility: (1) that Dr. Ketchum never personally examined Semen-

tilli; (2) that Dr. Ketchum was not present when the accident occurred; and (3) that Dr. Ketchum was not privy to Sementilli's thought processes just prior to the accident. In relying on these three reasons for excluding Dr. Ketchum's testimony, the district court abused its discretion.

■ Federal Rule of Evidence 702 provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

Fed.R.Evid. 702. In determining whether expert testimony is admissible under Rule 702, the district court must keep in mind Rule 702's "broad parameters of reliability, relevancy, and assistance to the trier of fact." *Derosiers v. Flight Int'l of Fla.*, 156 F.3d 952, 960–61 (9th Cir.1998). Moreover, because Dr. Ketchum's declaration does not constitute "scientific" testimony, but rather testimony based on the doctor's training and experience, the standards set out in *Daubert v. Merrill Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), governing admissibility of scientific expert testimony, do not apply. *See Derosiers*, 156 F.3d at 960–61; *McKendall v. Crown Control Corp.*, 122 F.3d 803, 807–08 (9th Cir.1997) (holding that the *Daubert* factors do not apply to expert testimony based on the expert's experience and training).

Neither party disputes that Dr. Ketchum qualifies as an expert by virtue of his "knowledge, skill, experience, training, or education." Furthermore, it is clear that Dr. Ketchum's knowledge would assist the fact-finder in understanding the evidence and determining an issue of material fact-the existence of causation.

■ The unique working conditions of a seaman aboard a vessel, and the risks and possible consequences of a person with Sementilli's physical and psychological background working as a seaman on a vessel, are beyond the common experience of the average layman. Whether Sementilli's psychological and physical conditions could have contributed to his continuing to place a rug upside-down on the floor, and slipping on the upside-down rug when stepping off an elevator carrying a tray of frozen meat weighing more than fifty pounds in rolling seas, are also beyond the common experience of the average layman. Dr. Ketchum's expert testimony would assist the trier of fact in understanding the significance of the conditions at sea and the possible consequences of having physical and psychological incapacities such as those experienced by Sementilli while working at sea. Dr. Ketchum's expert testimony was therefore admissible under Rule 702 to assist the fact-finder in understanding the evidence and in determining whether Sementilli's incapacities were a substantial factor in bringing about the accident. *See* Fed.R.Evid. 702; *Maffei v. Northern Ins. Co. of N.Y.*, 12 F.3d 892, 897 (9th Cir.1993).

■ The facts that Dr. Ketchum did not personally examine Sementilli, was not personally present at the accident scene, and was not "privy" to Sementilli's thought processes just prior to the accident do not render his otherwise admissible expert testimony inadmissible. Federal Rule of Evidence 703 allows an expert to base his or her opinions and inferences on facts and/or data "perceived by or made known to the expert at or before the hearing." Fed.R.Evid. 703. Thus, as the Supreme Court has recognized: "Unlike an ordinary witness, see Rule 701, an expert is permitted wide latitude to offer opinions, *including those that are not based on firsthand knowledge or observation.*" *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 592, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993) (emphasis added). Dr. Ketchum's opinions and inferences were based on his review of Sementilli's medical records, as well as his knowledge, experience, training and education. Under Rule 703, Dr. Ketchum was allowed to rely on such information in forming his opinion. The district court's decision to exclude this evidence based on Dr. Ketchum's lack of firsthand knowledge or personal observation was an abuse of discretion. *See United States v. Morales*, 108 F.3d 1031, 1035 (9th Cir.1997) ("A district court abuses its discretion when it bases its decision on an erroneous view of the law....").

## IV.

The district court erred in refusing to consider Dr. Ketchum's declaration in deciding the summary judgment motion and in granting summary judgment in favor of Dr. Taus. We therefore REVERSE and REMAND for further proceedings.

T.G. NELSON, Circuit Judge, specially concurring:

I concur in the court's opinion. I disagree with the district court's analysis of causation, and write separately to focus on my view of the difference between cause in fact and legal cause.

The district court found as a matter of law that Dr. Taus's certification was the cause in fact of the accident, but found insufficient evidence that the certification was a proximate cause of the accident. The causation prong of an action in negligence, or any other tort, contains two elements: (1) causation in fact, and (2) legal cause.[1] *See Hines v. United States,* 60 F.3d 1442, 1449 (9th Cir.1995) ("An essential element of a plaintiff's cause of action for negligence is that the defendant's act be both a cause-in-fact and a [legal cause] of any damage to the plaintiff."); *Exxon Co. v. Sofec, Inc.,* 54 F.3d 570, 576 (9th Cir.1995) (recognizing that a plaintiff "cannot recover from a party whose actions or omissions are deemed to be causes in fact, but not legal causes of the damage"), *aff'd,* 517 U.S. 830, 116 S.Ct. 1813, 135 L.Ed.2d 113 (1996); *Sundance Land v. Community First Fed. Sav. &*

*Loan,* 840 F.2d 653, 662 (9th Cir.1988) (recognizing that a party must show that the wrongful conduct was both the "factual and legal cause of the injury"). *See also* W. Page Keeton et al., *Prosser & Keeton on the Law of Torts,* § 41 at 263–64 (5th ed.1984); *Mitchell v. Gonzales,* 54 Cal.3d 1041, 1 Cal. Rptr.2d 913, 819 P.2d 872, 876 n. 4 (1991).[2] I will analyze each of these causation elements in turn.

### A. Causation in Fact

In finding Dr. Taus's certification to be the cause in fact of Sementilli's injury, the district court applied the "but for" test of causation: "But for Taus' pre-employment approval of [Sementilli's] seaworthiness, [Sementilli] would not have been on board the S.S. Admiralty Bay, would not have therefore been injured, and would not have subjected Trinidad to liability." Although I agree with the district court's conclusion that "but for" Dr. Taus's certification Sementilli would not have been injured, I disagree that this ends the cause in fact inquiry. As this court recognized in *Benefiel v. Exxon Corp.,* 959 F.2d 805, 807 (9th Cir.1992), "uniformly accepted principles of tort law ... require a plaintiff to prove more than that the defendant's action triggered a series of other events that led to the alleged injury." A plaintiff must also show that the defendant's action was a "substantial factor in bringing about [the] harm." *Id. See also Ribitzki v. Canmar Reading & Bates, Ltd.,* 111 F.3d 658, 665 (9th Cir.1997) ("Causation is established by

1. Much confusion surrounds the term "proximate cause." In some cases, the term proximate cause is used to mean both "factual cause" and "legal cause." *See, e.g., USAir, Inc. v. United States Dep't of Navy,* 14 F.3d 1410, 1413–14 (9th Cir.1994) ("To recover damages for negligence a plaintiff must prove that the defendant's conduct was a proximate or legal cause of his injuries. Causation in fact is one necessary element of proximate cause."); *Sundance Land v. Community First Fed. Sav. & Loan,* 840 F.2d 653, 662 (9th Cir.1988) ("Proximate causation ... requires that the wrongful conduct be both the factual and legal cause of the injury."). In other cases, the term proximate cause is used to mean only "legal cause." *See, e.g., Hines v. United States,* 60 F.3d 1442, 1449–50 (9th Cir.1995) ("An essential element of a plaintiff's cause of action for

negligence is that the defendant's act be both a cause-in-fact and a proximate cause of any damage to the plaintiff.... On the question of proximate (or legal) cause....") Because of this confusion, I avoid using the term "proximate cause" altogether, and instead simply distinguish between the requirements of legal cause and factual cause.

2. In determining whether a defendant's conduct "was sufficiently related to the resulting harm to warrant imposing liability for that harm on the defendant, courts sitting in admiralty may draw guidance from, inter alia, the extensive body of state law applying proximate causation requirements and from treatises and other scholarly sources." *Exxon Co. v. Sofec, Inc.,* 517 U.S. 830, 839, 116 S.Ct. 1813, 135 L.Ed.2d 113 (1996).

showing that the unseaworthy condition was a substantial factor in causing the injury."); *Faraola v. O'Neill & Yacht Marie Celine*, 576 F.2d 1364, 1366 (9th Cir.1978) ("To recover, the unseaworthiness would have had to have been a substantial factor in producing appellant's injuries."); *Rutherford v. Owens–Illinois, Inc.*, 16 Cal.4th 953, 67 Cal. Rptr.2d 16, 941 P.2d 1203, 1214 (1997) ("The substantial factor standard, however, has been embraced as a clearer rule of causation [than the 'but for' test]-one which subsumes the 'but for' test while reaching beyond it to satisfactorily address other situations, such as those involving independent or concurrent causes in fact.").

In the present case, there are several possible causes of the accident-Sementilli's preexisting orthopedic and psychological disabilities, the conditions at sea at the time that Sementilli slipped and fell, and Sementilli's act of lifting almost three times more weight than he was supposed to. It is not clear whether any of these causes were enough to bring about the slip and fall on its own. It is also not clear the extent to which each of these causes played a role in bringing about the injury.

It is, however, clear that Sementilli had many physical and psychological problems. He had previously been injured and had chronic orthopedic and psychological impairments that precluded his working in the exact type of environment that he was injured in, and precluded him from doing the job duties that he was doing when injured-lifting more than twenty pounds in an unstable, vibrating, wet, noisy environment. Furthermore, although it is true that Sementilli slipped on an upside-down rug, there is, at minimum, a question of fact as to why the rug was upside-down to start with, and whether the slip was caused, in whole or in part, by the exact physical and mental incapacities that Dr. Taus failed to reveal when he filled out the form certifying Sementilli as fit-for-duty. Based on these facts, a reasonable fact-finder could conclude that Sementilli's preexisting disabilities were substantial factors in bringing about the injury.

I therefore conclude that the district court's finding that, as a matter of law, Dr. Taus's certification was a cause in fact of Sementilli's injury was incorrect. This is a question of fact that can be answered only after a full trial. If the fact-finder determines that Dr. Taus knew or reasonably should have known of Sementilli's physical and mental incapacities, and further determines that these incapacities were a substantial factor in bringing about Sementilli's injury, this would establish that Dr. Taus's certification was the cause in fact of Sementilli's injuries.

### B. *Legal Causation*

Once it has been established that the defendant's conduct is a substantial factor, and therefore a cause in fact, of the plaintiff's injury, the question remains whether the defendant's conduct is the legal cause of the injury. *See Exxon Co. v. Sofec*, 517 U.S. 830, 839, 116 S.Ct. 1813, 135 L.Ed.2d 113 (1996) (recognizing that "defendant's blameworthy act [must be] sufficiently related to the resulting harm to warrant imposing liability for that harm on the defendant"); *Sofec*, 54 F.3d at 576 (recognizing that a plaintiff "cannot recover from a party whose actions or omissions are deemed to be causes in fact, but not legal causes of the damage"). *See also* Restatement (Second) of Torts § 440 cmt. b (1965) ("[S]uperseding cause relieves the actor of liability, irrespective of whether his antecedent negligence was or was not a substantial factor in bringing about the harm.") As the United States Supreme Court recognized in *Sofec*, the legal cause element is a necessary limitation on liability:

> In a philosophical sense, the consequences of an act go forward to eternity, and the causes of an event go back to the dawn of human events, and beyond. Nevertheless, the careless actor will not always be held for all damages for which the forces that he risked were a cause in fact. Somewhere a point will be reached when courts will agree that the link has become too tenuous-that what is claimed to be consequence is only fortuity. Thus, if the negligent destruction of the Michigan Avenue Bridge had delayed

the arrival of a doctor, with consequent loss of a patient's life, few judges would impose liability.

517 U.S. at 838–39, 116 S.Ct. 1813 (quotations and citations omitted).

The determination of whether legal cause exists depends upon "whether the policy of the law will extend the responsibility for the conduct to the consequences which have in fact occurred." *Sundance,* 840 F.2d at 663. This inquiry is not subject to absolute rules, but rather must be made on a case-by-case basis, and in light of considerations of logic, common sense, justice, policy and precedent. Keeton, *supra,* at 279. *See also Sofec,* 517 U.S. at 839, 116 S.Ct. 1813 ("The best use that can be made of the authorities on [legal] cause is merely to furnish illustrations of situations which judicious men upon careful consideration have adjudged to be on one side of the line or the other.") (quoting Keeton, *supra,* at 279). Furthermore, because the present case deals with an injury to a seaman sustained while aboard a vessel, the facts must be viewed in light of the unique policies that surround the law of admiralty.

Under the law of admiralty, seamen are given heightened legal protection. This heightened protection recognizes the peculiarity of seamen's lives, and their exposure to the perils of working at sea. *See Chandris, Inc. v. Latsis,* 515 U.S. 347, 354, 115 S.Ct. 2172, 132 L.Ed.2d 314 (1995). ("[S]eamen are 'emphatically the wards of the admiralty' because they 'are by the peculiarity of their lives liable to sudden sickness from change of climate, exposure to perils, and exhausting labour.'"). If injured in the course of their duty at sea, seamen may recover "maintenance and cure" from their employer for any injuries incurred in service of the vessel; damages from the vessel's owner for injuries incurred as a result of the unseaworthiness of the vessel; and, under the Jones Act, damages in negligence for any injury incurred "in the course of his employment." *Id.* (citing 46 U.S.C.App. § 688(a)).

To effectuate this heightened protection afforded seamen, a heavy burden is imposed on vessel owners, who are often held vicariously liable for the acts of third parties causing injury to seamen. To ease that burden, the United States Supreme Court, in *Ryan Stevedoring Co. v. Pan–Atlantic S.S. Co.,* 350 U.S. 124, 76 S.Ct. 232, 100 L.Ed. 133 (1956), developed a theory of indemnification whereby vessel owners could recover against third parties who breached the warranty of workmanlike performance. *Flunker v. United States,* 528 F.2d 239, 242 (9th Cir.1975). This allowed vessel owners to not only shift some of the heavy burden placed upon them, but also "to place ultimate liability on the party who was truly at fault and who should mend his negligent ways to prevent future injury." *Id.* 243.

Special rules have evolved to govern suits for indemnification in admiralty. These rules are designed "to minimize the hazards encountered by seamen, to compensate seamen for the accidents that inevitably occur, and to minimize the likelihood of such accidents." *Italia Societa per Azioni di Navigazione v. Oregon Stevedoring Co.,* 376 U.S. 315, 324, 84 S.Ct. 748, 11 L.Ed.2d 732 (1964). To carry out this design, the rules attempt to place the burden of compensating the injured seaman on "the party best situated to adopt preventive measures and thereby to reduce the likelihood of injury." *Id. See also DeGioia v. United States Lines Co.,* 304 F.2d 421, 426 (2d Cir.1962) ("The function of the doctrine of ... indemnification is allocation of the losses caused by shipboard injuries to the ... institution or institutions most able to minimize the particular risk involved.").

The Fifth Circuit, in addressing a situation closely analogous to the situation before this court, demonstrated how these special admiralty indemnity rules work. In *Miles v. Melrose,* 882 F.2d 976 (5th Cir.1989), a seaman died after being stabbed at least sixty-two times by Melrose, a fellow crew member. The mother of the deceased seaman brought an action against the vessel's owners and operators for negligence under the Jones Act and for unseaworthiness. The vessel owners, in turn, sought indemnity from the union, whose hiring hall had referred Melrose to the vessel. The vessel owners claimed that the union hiring hall had breached a duty to them by failing to warn them of Melrose's

violent propensities. *Id.* at 989–90. The Fifth Circuit agreed.

In holding that the union could be held liable, the court first recognized that an unfit seaman can render a vessel unseaworthy and therefore expose a vessel to liability:

> A ship is unseaworthy unless it and all of its appurtenances and crew are reasonably fit and safe for their intended purpose. The shipowner has an absolute duty to provide the members of his crew with such a seaworthy vessel, an obligation not dependent on fault. Just as a dangerous mast, a defective line, or a damaged hull may render a vessel unseaworthy, so may a seaman who is not reasonably fit. To establish such unseaworthiness, a plaintiff must prove that the crewmember was not "equal in disposition and seamanship to the ordinary men in the calling."

*Id.* at 981 (footnotes omitted).

The court then examined whether a union has a duty under general maritime law to warn a vessel owner or operator of the known violent propensities of a member sent to work on the vessel. *Id.* at 991. In finding that such a duty existed, the court stated:

> The shipowner or operator is particularly vulnerable and dependent upon the union because it must hire workers through the union hiring hall. In the context of the owner/operator's absolute liability if a worker does not meet the standard of his calling, this referral relationship is sufficient to impose a duty on the union to warn the vessel if it sends a dangerous seaman.
>
> Furthermore, the concern of maritime law with the safety of seamen is promoted more by allowing than by denying this third-party suit for indemnity or contribution. The shipowner is still absolutely liable for providing a seaworthy vessel; that duty does not shift to the union. Nevertheless, a union who knows and foresees that a member will injure others, when the employer lacks such knowledge, is in a unique position to prevent the harm by not referring him to a vessel. Allowing the vessel to seek indemnity from the union promotes the purposes of the doctrine of unseaworthiness by "placing liability on the party who was truly at fault and who should mend his negligent ways to prevent further injury. . . ."
>
> . . . .
>
> We hold that because of the union's active role in sending workers to vessels, the special relationship between the union and the maritime employer, the union's unique ability to prevent the harm, and admiralty law's concern with the safety of seamen, the union has a duty under the general maritime law toward the owner or operator of a vessel to exercise reasonable care when it knows of a worker's violent propensities and can foresee that he consequently may assault other crew members and thereby expose the employer to liability.

*Id.* at 992–93 (footnotes omitted).

Similarly, in the present case, Trinidad is particularly vulnerable and dependent upon the union-designated physician to send it only seamen that are fit for duty at sea. Trinidad is required to hire through the union, and must hire the candidate that the union sends out unless the seaman is not "qualified." To protect itself from unseaworthy seamen, Trinidad requires seamen to undergo a preemployment physical. Only if the seaman is certified by the union-designated physician as fit-for-duty does Trinidad accept the seaman aboard its vessel for duty. This relationship is sufficient to impose a duty on the physician to exercise reasonable care in certifying seamen.

Furthermore, the concern of maritime law with the safety of seamen is promoted more by allowing than by denying this suit for indemnity. Trinidad is still under an absolute duty to provide a seaworthy vessel; that duty does not shift to the union-designated physician. Nevertheless, the physician who examines a seaman for certification is in a unique position to prevent the harm by not certifying an unfit seaman as fit-for-duty. In fact, the physician is the "last stop" before a seaman boards a vessel and the *only way* that Trinidad can screen a potential seaman to determine whether he or she is fit-for-

duty. Allowing indemnification actions against a physician that has negligently, or intentionally, certified an unfit seaman as fit-for-duty, where the unfit condition of the seaman is a substantial factor in causing an accident and resulting injury, is the only way that "ultimate liability" will be placed "on the party who was truly at fault and who should mend his negligent ways to prevent future injury." *See Flunker*, 528 F.2d at 243.

Public policy considerations and a "rough sense of justice" support this result. *See Hunley v. Ace Maritime Corp.*, 927 F.2d 493, 497 (9th Cir.1991). Dr. Taus made numerous misrepresentations as to Sementilli's psychological and physical condition. At the same time that he was certifying Sementilli as fit-for-duty, he was certifying to a disability insurer that Sementilli was permanently disabled from working as a shoreside baker. The preemployment physical examination form signed by Dr. Taus stated that Sementilli had *never* suffered from any previous injuries, back complaints, depression or nervous troubles, and concluded that Sementilli was fit for duty. This form was signed *after* Dr. Taus had diagnosed Sementilli as suffering from swollen ankles, gout,[3] acute gout, and left and right ankle sprain on more than twenty occasions; despite Dr. Taus's knowledge that Sementilli had suffered from depression, anxiety and nervous troubles since 1985; despite Dr. Taus's finding that Sementilli was permanently disabled from working as a shoreside baker due to bursitis, tendinitis, hypertension and depression; and despite Dr. Taus's disqualification of Sementilli from jobs involving lifting weights in excess of twenty pounds, jumping, running, climbing, crawling, or working conditions that were noisy, subject to sudden temperature changes or which involved cramped quarters, high places or vibrations.

In sum, admiralty law's purposes of protecting seamen and placing ultimate liability on the party best situated to adopt preventive measures, as well as general public policy and a rough sense of justice, support the

conclusion that Dr. Taus's certification, if found to be a substantial factor in bringing about Sementilli's injury, is also the legal cause of the injury.

### C. *Foreseeability, Intervening Causes and Shifting Responsibility*

Although I conclude that the legal cause element is met, there are several legal causation problems that, at first glance, appear to be at issue in this case. I will address each of these perceived problems in turn.

#### 1. *The Issue of Foreseeability*

The question of foreseeability addresses whether a defendant should be held liable for consequences that he could not have anticipated would result from his conduct. For example, if a defective platform offers at most the foreseeable possibility of a sprained ankle, "but as a result of it a passenger dies of inflammation of the heart," should the defendant be held liable? Keeton, *supra*, § 43 at 280. Or, as another example, if a defendant's "negligent driving threatens another with something like a broken leg, but instead causes the other to be shot," should the negligent driver be held liable for the resulting injury? *Id.*

This area of the law of torts is perhaps the most controversial. *Id.* It must, however, be stressed once again that the foreseeability problem, as part of the legal cause determination, is *not* a question of factual cause, and indeed never arises until after factual causation has been established. It is, instead, a question of policy that addresses the extent to which a defendant will be held responsible. *Id.* at 281.

As will be seen, there is no foreseeability problem in the present case. Sementilli suffered from various physical and mental incapacities. He was not to lift anything over twenty pounds and was not to work in the conditions that are present aboard a vessel at sea. He had recently been diagnosed with lower back sprain and arthritis of the hip. He had chronic gout, tendonitis and bursitis, and ankle sprain. He also suffered from

---

**3.** Gout is a form of arthritis usually found in the joints of the feet and hands, especially the big toe. Webster's New World Dictionary 583 (3d college ed.1988).

chronic depression, anxiety and nervous conditions. Based on these incapacities-of which Dr. Taus was intimately familiar-it was a clearly foreseeable "risk" that Sementilli may slip and fall while attempting to engage in the rigorous duties of a seaman, which included lifting and carrying heavy weights in a wet, cold, vibrating and unstable environment. Because the "harm" that occurred-Sementilli's slip and fall and resulting injuries-was within the foreseeable "risk" created by Dr. Taus's certification, there is no foreseeability problem.

### 2. *The Issue of Intervening Causes*

The question of intervening causes addresses whether a defendant should be held liable for an injury to which the defendant has made a substantial contribution, when that injury is brought about by a later cause of independent origin over which the defendant has no control or responsibility. *Id.* § 44 at 301. Once again, the question in not about factual causation, but rather a question of policy that addresses the extent to which the defendant will be held liable. *Id.*

In the present case, the intervening causes at issue are the conditions at sea at the time that Sementilli slipped and fell, and Sementilli's carrying of two to three times more weight than he was supposed to.

As to the conditions at sea, Dr. Taus knew of the adverse conditions at sea when he certified Sementilli as fit to go out to sea. He knew that Sementilli would be subjected to rolling seas, a wet, vibrating, noisy environment, and hard physical labor. The general conditions at sea are, therefore, insufficient intervening causes to relieve Dr. Taus of liability.

As to the specific condition of the upside-down rug, as previously discussed, there is at minimum a question of fact as to why the rug was placed upside-down to start with and why Sementilli continued to place it upside-down. The continued placement of the rug in the upside-down position could well have been a result of Sementilli's psychological problems. Moreover, it is possible that Sementilli's psychological problems resulted in a lack of concentration at the time that he

was stepping off the elevator with the tray of frozen meat. In fact, Dr. Ketchum opined that Sementilli's preexisting psychological problems "quite probably gave rise to 'difficulty in thinking' and 'psychomotor retardation,'" which "may well have caused or contributed to Mr. Sementilli's slip-and-fall accident." Finally, it is possible that if Sementilli had truly been an able bodied seaman, he may not have slipped on the upside-down rug to start with, or may have at least been able to recover from the slip and therefore not fallen. These are all questions that must be answered by the fact-finder.

That a question of fact remains on the role the upside-down rug played in the slip and fall does not, however, prevent me from addressing the problem of whether, as a matter of law, the upside-down rug was an intervening cause that should relieve Dr. Taus of liability. This is because I can assume, for purposes of this inquiry, that the fact-finder has concluded that Sementilli's preexisting disabilities were substantial factors in bringing about the accident.[4]

Under this assumption, I conclude that the upside-down rug is not an intervening cause sufficient to relieve Dr. Taus of liability. Dr. Taus knew that Sementilli would be exposed to an unstable environment which would require Sementilli to negotiate around and over obstacles in adverse conditions and carry heavy weights. These obstacles might include hoses, lines, slick areas on deck and below deck, and misplaced tools, buckets, rugs, etc. Despite this knowledge, Dr. Taus certified Sementilli as fit to handle these types of conditions.

Finally, the fact that Sementilli was carrying two to three times more weight than he was supposed to at the time that he was injured is also insufficient to relieve Dr. Taus of liability. As previously discussed, Dr. Taus knew that an ordinary part of a seaman's job is lifting heavy weights, and certified Sementilli as fit-for-duty despite this knowledge.

---

4. The reason that I can make this assumption is that unless the fact-finder determines that the

disabilities were a substantial factor in bringing about the accident, there can be *no* liability.

### 3. *The Issue of Shifting Responsibility*

The final question—shifting responsibility—deals with those situations in which a third person has discovered the forces set in motion by the defendant prior to the injury occurring. In other words, if the vessel had discovered that Sementilli was not fit-for-duty prior to his accident, the responsibility of the accident *may* have been shifted from Dr. Taus to Trinidad. There is, however, no evidence that the vessel knew that Sementilli was not an able-bodied seaman prior to the accident, and there is therefore no basis for shifting the responsibility for the wrongful certification.

In sum, the issue of cause in fact remains to be decided by the trier of fact. If the finding is that Dr. Taus's conduct was a cause in fact of the injuries to Sementilli, then I see no legal causation arguments that would preclude entry of judgment for Trinidad. That question, however, would remain for decision by the district court on the record actually made there. I offer my above analysis only for such assistance as the district court may derive from it.

FLETCHER, Circuit Judge, Dissenting:

I respectfully dissent.

Like the majority, I believe that we should hold to a high standard persons who have a role in seeing to the seaworthiness of ships, including crew.

The narrow issue presented in this case, however, is whether the district court abused its discretion in excluding the testimony of Dr. Ketchum. *See General Electric Co. v. Joiner,* —— U.S. ——, ——, 118 S.Ct. 512, 517, 139 L.Ed.2d 508 (1997) ("[A]buse of discretion is the proper standard of review of a district court's evidentiary rulings."). Without Dr. Ketchum's testimony, summary judgment in favor of Dr. Taus was appropriate since that testimony was Trinidad's only evidence that the actions of Dr. Taus were the proximate cause of Trinidad's injury-that is, the monetary loss Trinidad suffered because of liability to Mr. Sementilli resulting from his ship-board fall.

The Supreme Court has emphasized, particularly with regard to scientific expert testimony, that the district courts must act as "gatekeepers," and the courts of appeals must respect the role of the district courts in that regard. *See id.; accord Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 590, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993); *see also McKendall v. Crown Control Corp.,* 122 F.3d 803, 806–07 & n. 1 (9th Cir.1997) ("[T]he *Daubert* Court is giving strong advice to district courts: in ruling on admissibility, trial judges are the gatekeepers and should pay particular attention to the reliability of the expert and his or her testimony.").

The Supreme Court recently reiterated in *General Electric* that the district court " 'must ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable.' " —— U.S. at ——, 118 S.Ct. at 517 (quoting *Daubert,* 509 U.S. at 589, 113 S.Ct. 2786). The Court held that the trial court did not abuse its discretion in excluding expert testimony regarding the causation of the plaintiff's lung cancer as "nothing more than speculation." *Id.,* 118 S.Ct. at 518. The Court emphasized that "nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence which is connected to existing data only by the *ipse dixit* of the expert." *Id.* at 519.

In the case before us, the district court's reasons for excluding Dr. Ketchum's testimony were that Dr. Ketchum had not examined Mr. Sementilli (only Dr. Taus' medical records), that Dr. Ketchum had not been present when the accident took place, and that Dr. Ketchum was not privy to Sementilli's thought processes just prior to the accident. He concluded that the Dr. Ketchum's opinion was too speculative to be admitted. I submit these are all good reasons for exclusion.

Nevertheless, the majority opinion holds that the district court abused its discretion in excluding Dr. Ketchum's testimony. The authority cited by the majority provides no support for this holding. In two of the cases cited by the majority, it was held that there was no abuse of discretion in admitting expert testimony. *See Sentilles v. Inter–Caribbean Shipping Corp.,* 361 U.S. 107, 109, 80 S.Ct. 173, 4 L.Ed.2d 142 (1959); *Omar v. Sea–Land Service, Inc.,* 813 F.2d 986, 991 (9th Cir.1987). Just so, but the question

**1142**

before us is whether it was an abuse of discretion to exclude the expert testimony.

In the other two cases cited by the majority, the expert whose testimony was excluded conducted extensive on-site investigations of the accident locations at issue. *See Maffei v. Northern Ins. Co. of New York,* 12 F.3d 892, 895 (9th Cir.1993) (on-site investigation of warehouse to determine possible cause of fire); *Bieghler v. Kleppe,* 633 F.2d 531, 533 (9th Cir.1980) (on-site investigation of tunnel where motorcycle accident occurred).

By contrast, here Dr. Ketchum never examined either Mr. Sementilli or the site of the accident. Although experts generally may rely on the reports of other physicians in developing their opinions, Dr. Ketchum couldn't know whether Dr. Taus's reports were accurate. (Perhaps Dr. Taus exaggerated the patient's disabilities to get him disability pay just as he probably exaggerated how able he was to go to sea.) More importantly, Trinidad has not explained how Dr. Ketchum could possibly know, as he asserts that he does, that Mr. Sementilli's mental state contributed to the accident.

Perhaps the district court would not have abused its discretion had it decided to admit Dr. Ketchum's testimony. But that is not the question before us. The nature of our review of evidentiary rulings for abuse of discretion, as underscored by the Supreme Court in *General Electric,* involves substantial deference to the determinations of the district court. The majority has lost sight of the beacon lit by *Daubert.* We should be loathe to second guess the district court on such a call.

I would affirm.